17013

THE STATE, Respondent, v. HENRY JACKSON, Appellant
(87 S. E. (2d) 681)

*Messrs. John M. Scott* and *J. D. Whisenhunt,* of Florence, *for Appellant,*

*Messrs. J. Reuben Long, Solicitor,* and *J. M. Long, Jr.,* of Conway, *for Respondent,*

June 7, 1955.

TAYLOR, Justice.

Appellant, Henry Jackson, was convicted and sentenced to death for the crime of murder at the June, 1954, Term of General Sessions Court for Florence County and appeals.

The testimony shows that on April 24, 1954, appellant lived with his mother near the town limits of Timmonsville, South Carolina, whether "just in or out" the record isn't clear, in a three-room house constructed so that the rooms are in line, one behind the other, the front room being used by the mother as a bedroom, the next being used by appellant and a roomer, Cleveland Williams, as a bedroom, and the last as a kitchen.

On the night in question, appellant went to Florence, South Carolina, with a brother, he, the appellant, visited an eating place and drank some beer and whiskey. The hour being late and unable to locate his brother, he engaged a colored taxi driver to take him to his home in Timmonsville, agreeing to pay $3.00 fare "when I get there." Upon reaching the home, he went inside for the purpose of borrowing a dollar from his mother, but she declined to loan him any money stating that she "did not have a dollar." According to his testimony, when he was unable to get the money he did not report back to the cab driver but sat down on his bed and fell asleep. The taxi driver attempting to collect his fare knocked on both the front and rear doors but received no response. Upon hearing a bed squeak, he knocked at a window and was answered by the roomer, Williams, who told him that appellant was then asleep and that he would not attempt to wake him. The taxi driver then got in his car, drove to the business district of Timmonsville where he located a colored policeman by the name of Lucius Jenerette and told him of his difficulty. The policeman entered the car with the cab driver and returned to appellant's house where he knocked on both doors and windows with his blackjack in an attempt to contact the appellant, announcing that he was a policeman and wished to talk to him about the cab fare. While the deceased was knocking on the front door, appellant's mother who slept in the front room, according to the testimony of the appellant, his mother, and the roomer, Cleveland Williams, called out, "Don't knock my door down" or words of similar import.

The taxi driver, however, who was on the outside with the policeman, testified he did not hear such statement.

A portion of the appellant's testimony appears as follows:

"Q. After you went to sleep, what was the next thing you heard? A. When I woke up, after I went to sleep on the bed. I was at the foot of the bed lying across the bed, and when I woke up, Cleveland was pressing against me with his foot in the bed, and he called to me and said: 'Somebody out there,' and I got up, and when I got up there was knocking on the front door, and I walked from my room to the middle door, and when I got to the middle door, that is the time my mother said: 'Whoever that is, don't try to tear my door down.' I reached up over my head and took the gun down. When I made about two steps, I butt into a chair near the foot of the bed, and I turned where I could go get between the two beds and get out.

"Q. Were the windows closed? A. Yes, sir.

"Q. Could you see anything at all? A. No, sir. Before I could get my right foot around the foot of the bed, a flashlight flashed in my face, and I couldn't see nothing.

"Q. What happened? A. That time I snatched back on the hammer and turned loose.

"Q. After this happened, what did you do? A. After it happened, he fell, and before I could get close enough to put my head down to hear what he was saying he done quit saying anything. His flashlight was on the porch about three feet off. I walked up between his legs and reached over and picked up the flashlight.

"Q. When you picked up the flashlight, did you get blood on your hand? A. When I picked up the flashlight, it was something or nother wet. I don't know whether it was blood or what. I took the flashlight and shone on him, and I looks, and it was the police. * * *"

The shooting took place in the pre-dawn hours of Sunday morning, April 24, 1954. The prosecution takes the view that the deceased having received a complaint from the taxi

driver it was his duty to make proper investigation with a view to ascertaining whether or not he should obtain a warrant for appellant's arrest and was in the act of making such investigation when he knocked on the doors and window of appellant's home, at the same time saying, "Open up, this is the police. I want to talk to the fellow about the cab fare." That the front door although described as "locked" or "latched," opened easily and if opened by the deceased was done so through his efforts to arouse some of the occupants of the household by knocking thereon and appellant knowing him to be a policeman shot him down while on the porch without warning or just cause.

Under the view taken by the defense the appellant, when he was unable to borrow the money to pay the cab fare, sat down upon his bed and being in an intoxicated condition went to sleep almost immediately; that he was not aware that the cab driver had returned with a policeman who had been trying to arouse him but that he was awakened by Williams who told him there was "somebody out there"; that the front door was locked but could be pushed open if enough force was used and that the "somebody" was trying to enter the house through this door; that he got up and proceeded towards the front door when he heard his mother say, "Whoever that is don't· try to tear my door down"; that he took the gun from over the door between · the two bedrooms and had proceeded approximately two steps into his mother's bedroom when he was blinded by a flashlight which was shone in his face, he fired immediately, and. heard the body fall to the floor. Upon picking up the flashlight, which was still burning, and directing its beam upon the body, he learned for the first time that he had shot a policeman. They also take the position that had appellant known the identity of the deceased it would be of no consequence as he having forced the lock on the front door was inside the bedroom and having no arrest warrant was there illegally and, therefore, a trespasser and his position

relative thereto was no different from that of any other person.

Appellant in defending his person from an unlawful arrest had the right to use so much force as was apparently necessary to accomplish his deliverance and no more. *State v. Byrd,* 72 S. C. 104, 51 S. E. 542. See also *State v. Petit,* 144 S. C. 452, 142 S. E. 725. And in *State v. Bradley,* 126 S. C. 528, 120 S. E. 240, 242, this Court used the following language:

" 'Of course, if the entry itself is made in a reckless, riotous or violent manner, or is effected by overcoming the physical or verbal opposition of the occupant, or is made under such circumstances as manifestly evidence a purpose to endanger the life or limb of any inmate, or to commit a felony on them, the habitation or property therein, in other words, is not quiet and peaceable, no request to depart, or the laying on of hands, need precede, as a legal requirement, the act of ejectment by such force as is necessary, even to the killing of the assailant, for the very obvious reason, as is well said in one of the cases, "since the trespasser knows as well without express words as with, that his absence is desired." ' "

We are therefore of the opinion that the trial Judge did not commit error in his refusal to grant appellant's motions for a directed verdict of not guilty and for judgment *non obstante veredicto* but was correct in submitting the factual issues to the jury.

At the conclusion of the Judge's charge to the jury, he inquired of counsel: "Anything further for the State, Mr. Long.

"Mr. Long: No, sir, nothing further.

"Mr. Scott: You did not charge self defense.

"The Court: I don't think there is any element of self defense.

"Mr. Scott: He had a blackjack in his hand.

"The Court. I don't think the element of self defense is in it. I don't recall any testimony of an intended attack against the defendant."

The test is not whether there was testimony of an ■ *intended* attack but whether or not the appellant *believed* he was in imminent danger of death or serious bodily harm, and he is not required to show that such danger actually existed because he had a right to act upon such appearances as would cause a reasonable and prudent man of ordinary firmness and courage to entertain the same belief.

There is testimony to the effect that the deceased ■ requested the taxi driver to find him a small stick to be used in lifting the latch on the door but that the door was opened before the stick was found, according to appellant, by being forced by the deceased and having forced the door open, entered immediately into the bedroom where he was shot. There is also testimony to the effect that the deceased had his blackjack in his hand and was using such to knock on the doors and windows and that this blackjack was found the day following the killing in some grass and weeds across the street from where the shooting occurred. How it got there is unexplained in the record. We are therefore of the opinion that the defendant was entitled to the benefit of a charge on the law of self-defense. Some of the elements of which are that one who so pleads must be without fault in bringing on the difficulty or the necessity of taking human life, it being obvious that one cannot through his own fault bring on a difficulty and then claim the right of self-defense; that at the time the defendant fired the fatal shot, he believed he was in imminent danger of losing his own life or of sustaining serious bodily harm and that a reasonable and prudent man, a man of ordinary firmness and courage in like circumstances would have reached the same conclusion; that he must show that he *believed* that he was in imminent danger, *not* that he was *actually* in such danger, because he had the right to act upon

appearances, and under the circumstances, as they appeared to him, he believed he was in such danger, and a reasonable, prudent man of ordinary firmness and courage would have entertained the same belief. Further, he must show that he had no other probable means of escape except to take the life of his assailant or stated another way, that he had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily harm than to act as he did in the particular instance; that it is one's duty to avoid taking human life where it is possible to prevent it even to the extent of retreating from his adversary unless by doing so the danger of being killed or suffering serious bodily harm is increased or it is reasonably apparent that such danger would be increased. Further, a man's home is his castle where if he or a member of his family is assaulted in the home, he is not required to retreat but may use such force as is reasonably necessary to protect himself or a member of his family from death or serious bodily harm and may combine such force as is reasonably necessary to eject the assailant even to the extent of taking life. 26 Am. Jur., Sec. 158, page 265; 40 C. J. S., Homicide, § 108, p. 969; *State v. Francis,* 152 S. C. 17, 149 S. E. 348, 70 A. L. R. 1133; *State v. Ballentine,* 130 S. C. 123, 125 S. E. 291; *State v. Hardin,* 114 S. C. 280, 103 'S. E. 557. See also *State v. Grantham,* 224 S. C. 41, 77 S. E. (2d) 291 and cases cited therein. The slaying, according to the contention of the State, occurred on the porch of the house occupied by appellant and his mother and, according to the appellant, in the bedroom. It is therefore apparent that it was under either contention within the curtilage and that portion of the law of self-defense which requires one to retreat unless it is reasonably apparent that in doing so he would increase the danger is not applicable under the facts of the instant case. *State v. Hewitt,* 205 S. C. 207, 31 S. E. (2d) 257; *State v. Quick,* 138 S. C. 147, 135 S. E. 800; *State v. Gordon,* 128 S. C. 422, 122 S. E. 501; *State v. Gibbs,* 113 S. C. 256, 102 S. E. 333; *State v. Brooks,* 79 S. C. 144, 60 S. E. 518, 17

L. R. A., N. S., 483, 128 Am. St. Rep. 836; *Beard v. United States,* 158 U. S. 550, 15 S. Ct. 962, 39 L. Ed. 1086.

For the foregoing reasons we are of the opinion that the appellant was entitled to a charge on the law of self-defense as it is applicable to the facts in this case, that the judgment and sentence should be set aside and the case remanded to the Court of General Sessions for Florence County for a new trial; and it is so ordered.

STUKES and OXNER, JJ., concur.

BAKER, C. J., and LEGGE, J., concur in result.