## 20672

The STATE, Respondent, v. Homer O. HENDRIX, Appellant.

(244 S. E. (2d) 503)

654

*Eugene C. Griffith,* of *Blease, Griffith & Stone, Thomas H. Pope,* of *Pope & Schumpert,* Newberry, and *A. Frank Lever, Jr.,* Lexington, *for appellant.*

*Atty. Gen. Daniel R. McLeod* and *Asst. Atty. Gen Joseph R. Barker,* Columbia, *for respondent.*

May 1, 1978.

RHODES, Justice:

Appellant Homer O. Hendrix was convicted of voluntary manslaughter and sentenced to fifteen years imprisonment. Although several issues have been raised on this appeal, we need address only the lower court's refusal to direct a verdict in favor of the appellant since this issue is dispositive of this case. Finding that the appellant was entitled to a directed verdict, we reverse.

This case arose out of a tragic confrontation between Mr. Hendrix and Norman D. Cherry at Hendrix's lot on Lake

Murray in Saluda County on Labor Day, September 1, 1975. On that day appellant and his children were having a family outing at their property on the shore of Lake Murray.

It is clear from the testimony that ill feelings had characterized the relationship between Mr. Hendrix and Mr. Cherry. These ill feelings produced a tension between the two that culminated in Mr. Cherry's shooting death.

A neighbor at the lake of both appellant and the deceased testified for the State on direct examination that he talked to appellant that afternoon prior to the shooting. The witness stated that appellant told him of a confrontation that had occurred earlier that day with the deceased at appellant's tomato patch. The witness testified appellant stated "that Mr. Cherry told him (appellant) they were going to have to fight to settle this thing." In reply appellant "told Mr. Cherry that he was going to go home and get a gun and from then on he would have a gun in his truck."

Shortly afterwards Harold Black, a friend and next door neighbor, and his son, Francis Wayne Black, observed appellant drive down the road past Mr. Black's house and turn around in the deceased's driveway. The deceased was not at home at the time. As appellant drove back up the road, he passed the deceased who was driving down the road. As the two passed each other, the deceased stopped, opened his door, backed up about a foot, and then drove forward toward his house. Appellant did not stop.

According to Mr. Black, the deceased went into his (Cherry's) house, stayed approximately ten minutes, got back into his truck and drove off.

Almost immediately thereafter, Mr. Black and his son got into their truck and drove off in the direction the deceased had taken. In Mr. Black's words "I told my boy 'let's go up the road, there's something fixing to happen' because

Norman Cherry and Homer Hendrix wasn't getting along too good."

As they rode past appellant's lake lot they observed appellant and his son Richard sitting on the rear end of appellant's truck which was parked on appellant's lot. Both Blacks testified that appellant did nothing other than watch them go by. As they drove further down the road, the Blacks observed Russell Hendrix, appellant's grandson, getting a shotgun from appellant's house. This house was some distance down the road from appellant's lake lot.

The Blacks circled around, met the deceased and told him "that Homer Hendrix had gone to his house to get a gun."

The Blacks then drove to appellant's lake lot, stopped, got out of their vehicle and confronted appellant and his son. On cross examination Wayne Black stated that they stopped "to keep anything from happening."

According to the Blacks they went onto appellant's lot and Mr. Black accused Valjean Matthews, appellant's son-in-law, of going and getting appellant's gun, which Matthews denied. According to Mr. Black, Matthews pushed him and cursed him, whereupon Mr. Black hit Matthews and a fight erupted between the two men.

Shortly after the Blacks arrived at appellant's lot, the deceased arrived in his truck, slid to a stop in the road, jumped out and advanced toward appellant. It was stipulated at trial that Cherry's blood alcohol was .208 per cent.

Appellant, who was standing next to his truck, reached into the cab of his truck, pulled out his shotgun, leveled it at the deceased and told him three times to "back off". The deceased immediately spun around and walked back to his truck, reached into the cab and drew out his shotgun, and walked straight back to where the appellant was standing.

The deceased told appellant to put down the shotgun and "fight like a man". Although witnesses for the State testified the deceased never pointed his gun at appellant, wit-

nesses for the defense testified that the deceased pointed his shotgun at appellant's mid-section and told appellant, "Say your prayers, I'm going to kill you."

Another friend and neighbor of the deceased, Mrs. Doris Black, observed the commotion and approached the scene. When she saw the two men facing each other with shotguns, she screamed "Norman!" The deceased turned his head in the direction of the scream. As Cherry turned, appellant began firing. Appellant fired four times in rapid succession, killing Cherry.

Appellant was indicted for murder and convicted of the lesser included offense of voluntary manslaughter. At his trial appellant relied on the defense of self-defense but did not testify in his own behalf. Appellant contends the lower court erred by denying his motion for a directed verdict on the ground of self-defense.

In deciding whether the lower court erred in failing to direct a verdict in favor of a defendant in a criminal case, this Court must view the evidence in the light most favorable to the State. If there is any evidence, either direct or circumstantial, which reasonably tends to prove the guilt of the accused or from which guilt may be fairly and logically deduced, it is the lower court's duty to submit the case to the jury. Thus, in the present case, unless it can be said as a matter of law that self-defense was established, it was not error to submit the case to the jury.

Based upon the prior decisions of this Court, in order to establish self-defense, a defendant must ordinarily show:

(1) That he was without fault in bringing on the difficulty. *State v. Jackson,* 227 S. C. 271, 87 S. E. (2d) 681 (1955).

(2) That he actually believed he was in imminent danger of losing his life or of sustaining serious bodily injury,

*State v. Jackson, supra, or he actually was in imminent
danger of losing his life or of sustaining serious bodily injury, State v. Hardin,* 114 S. C. 280, 103 S. E. 557 (1920);
*State v. Miller,* 73 S. C. 277, 53 S. E. 426 (1906).[1]

(3) If his defense is based on his actual belief of imminent danger, that a reasonable prudent man of ordinary firmness and courage would have entertained the same belief, *State v. Jackson, supra,* or if his defense is based on his being in actual and imminent danger, that "the circumstances were such as would warrant a man of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm, or losing his own life," *State v. Hardin, supra.* 103 S. E. at 558.

(4) That he had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in the particular instance. *State v. Jackson, supra.*

> We conclude that self defense was established in this case and, as a matter of law, the appellant herein was entitled to a directed verdict of acquittal.

Beginning with the fourth element of self-defense, which is often called the "retreat doctrine", there is no question but that appellant was on his own land when the confrontation occurred. The trial judge charged the jury on this point and the State has admitted it. The law is well settled that "one

---

[1] In arguing for affirmance of the appellant's conviction, the State has erroneously assumed that the second element embraces only a showing that the accused *believed* he was in imminent danger of death or serious bodily harm. It is contended that since the defendant did not take the stand, such a belief has not been established in this case. The State's assumption is not correct. As an alternative to showing his belief, the accused may rely upon the circumstances of the case to demonstrate that *he actually was in imminent danger of losing his life or suffering serious bodily injury.* In *State v. Hardin, supra,* this Court approved the trial judge's jury charge that the defendant "must show you that at the time he struck the fatal blow *he was in danger* of receiving serious bodily harm or death . . .." 103 S. E. at 558. (emphasis ours). In *State v. Miller, supra,* we gave approval to the charge that "the party must be actually in imminent danger *or* he must believe he was in imminent danger . . .." 53 S. E. at 428. (emphasis ours).

attacked, without fault on his own part, on his own premises, has the right in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense." *State v. Hewitt,* 205 S. C. 207, 31 S. E. (2d) 257, 258 (1944). Appellant has no duty to retreat.

Turning to the first element, we find nothing to indicate the appellant provoked the fatal altercation.

■ It was alleged by the State's witnesses and admitted by the defense witnesses that appellant sent his grandson to his (appellant's) home to fetch his shotgun. When the grandson returned with the weapon, appellant placed it on the seat in the cab of his truck. A man arming himself on his own land in a legal manner after he has been threatened is not evidence of his being at fault in bringing on the difficulty.

When the deceased arrived and got out of his truck and approached appellant, the appellant at that point pulled out the shotgun, pointed it at the deceased, and told him to "back off" three times. The only reasonable explanation for this action is that appellant, who had reason to expect trouble, because of Cherry's earlier threat that they would fight, was trying to avoid a fight.[2] This would not constitute evidence of provocation.[3]

The second and third elements are clearly established by the evidence. While we are unable to say what the appellant's actual state of mind was at the time the fatal shots were

---

[2] The fact that appellant was on his own land with no duty to retreat and attempted to avoid the encounter and made this known to his adversary distinguishes this situation from that of mutual combat, for which self-defense is not available. See *State v. Porter,* S. C., 239 S. E. (2d) 641, filed Nov. 30, 1977; *State v. Graham,* 260 S. C. 449, 196 S. E. (2d) 495 (1973); *Nauful v. Milligan,* 258 S. C. 139, 187 S. E. (2d) 511 (1972); 40 C.J.S. Homicide § 122 (1944).

[3] While it is not necessary to our position, even if any of Hendrix's prior actions had constituted provocation, the appellant's act of ordering deceased away would have constituted a withdrawal after aggression which was communicated to the deceased and which would have restored appellant's right of self-defense. *See* 40 C.J.S. Homicide Sections 121, 133 (1944).

fired,[4] the conclusion that he was actually in immediate danger of losing his own life is inescapable. As set forth in the factual narrative, the relationship between the appellant and the deceased was characterized by ill feeling. Earlier in the day, the deceased told the appellant "they were going to have to fight to settle this thing". When the deceased arrived at the appellant's lot, he jumped out of his truck and advanced toward appellant who leveled his gun at the deceased and told him three times to "back off". The deceased immediately went to his truck and returned, his shotgun in hand, to confront the appellant. Although there is some controversy at this point as to exactly what followed, under any version of the evidence it is clear that an actual, imminent danger confronted the appellant—a danger which, unless met with an immediate response, held the promise of death for the appellant.

The appellant was sixty-five years of age—some fifteen to twenty years older than his adversary—and hardly a physical match for the younger man. The deceased was under the influence of alcohol, and his conduct evidenced no intent other than that he intended to do battle. These circumstances, combined with the deadly weapon with which the deceased was armed, leave no doubt as to the imminent peril portending death for the appellant.

Further, the only logical conclusion to be drawn from the circumstances is that they were such as to warrant a man of ordinary prudence, firmness and courage to strike the fatal blow to save his own life. By the time the deceased returned with his shotgun to face the appellant, death was in the offing and the appellant, having no duty to retreat and being without fault in bringing on the last and fatal confrontation, was warranted in reacting to the situation with force in order to preserve his own life. Once the appellant's right to fire in self-defense arose, he was not re-

---

[4] The appellant exercised his constitutional right not to take the stand at trial, and, thus, there is no statement from him as to what his actual belief was at the time.

quired to wait until his adversary was on equal terms or until he fired or aimed his weapon.

The difference in age; the fact of the prior bad blood between the two men; the heavy consumption of alcohol by Cherry; and the prior threat of the deceased are all factors which would give appellant the right to judge the conduct of his adversary more harshly than otherwise. See *State v. Boyd,* 155 S. C. 432, 152 S. E. 677 (1930) and *State v. Hardin, supra.*

The State has argued that appellant used excessive ██ force in his case by firing more than once because, under the testimony, in the light most favorable to the State, the first shot disabled the deceased. The rule is that ordinarily one is not justified in shooting or employing a deadly weapon after the adversary has been disarmed or disabled. 40 C. J. S. Homicide § 131(b) at 1020 (1944), and see *State v. Jackson, supra.* However, the rule is also that "when a person is justified in firing the first shot, he is justified in continuing to shoot until it is apparent that the danger to his life and body has ceased". 40 C. J. S. Homicide § 131(b) at 1020 (1944). In the light most favorable to the State, appellant fired four times in rapid succession and the deceased did not hit the ground until after the last shot was fired. Under these circumstances the force used was not excessive.

While this was a tragic homicide, the death of Cherry was precipitated by his own actions. The appellant, his children, and grandchildren were enjoying a tranquil picnic on his property when Cherry made his hostile entrance upon the scene. The events that followed have not only brought sorrow to the Cherry family, but have brought to the Hendrix family a traumatic experience not soon forgotten.

From the record before us, we can reach no other conclusion but that the appellant was acting in self-defense as

a matter of law when he shot the deceased. We reverse and remand for entry of verdict of acquittal.

Reversed and remanded.

Lewis, C. J., and Ness, J., concur.

Gregory, J., and Circuit Judge John Grimball, Acting Associate Justice, dissent.

Gregory, Justice (dissenting) :

I respectfully dissent.

The record in this case demonstrates the ill feelings that existed between Mr. Hendrix and Mr. Cherry. Their disagreements were of long standing and often times volatile. Both men armed themselves with shotguns in anticipation of the confrontation that resulted .in Mr. Cherry's death.

The final meeting between the two men occurred by chance on a portion of Mr. Hendrix's property next to a road. Hendrix ordered Cherry off the property at gun point, whereupon Cherry armed himself and refused to leave. Hendrix and Cherry faced each other in an armed stalemate. Words were exchanged between the two, and various family members attempted to persuade the men to leave.

When Cherry turned his head in response to Mrs. Doris Black's scream, Hendrix began firing his shotgun. Hendrix fired once, paused, and then fired three additional shots in rapid succession. After the shooting Hendrix telephoned a close friend and stated he shot Cherry when a distraction caused Cherry to turn his head.

When considering a motion for a directed verdict, it is the lower court's duty to submit the case to the jury if there is any evidence, either direct or circumstantial, which reasonably tends to prove the guilt of the accused or from which guilt may be fairly and logically deduced. *State v. Massey,* 267 S. C. 432, 229 S. E. (2d) 332 (1976).

Based on the testimony, at least two inferences can be drawn which explain why Hendrix shot and killed Cherry :

(1) that Hendrix acted under a reasonable apprehension of danger, either actual or apparent, in which case the killing was justified; or (2) that Hendrix acted out of malice, in which case the killing was unlawful.

The second element of self-defense requires proof that the defendant actually believed he was in immediate danger of losing his life or sustaining serious bodily harm. This element prevents a defendant from deliberately and maliciously killing his fellow man and then interposing the defense of self-defense because it subsequently appears there was actual danger. *Trogdon v. State,* 133 Ind. 1, 32 N. E. 725 (1892). See also *State v. Herron,* 116 S. C. 282, 108 S. E. 93 (1921).

The only evidence in this record regarding appellant's actual belief are the circumstantial conclusions that can be inferred from his actions. While this circumstantial evidence could have created a reasonable doubt of appellant's guilt in the jurors' minds, it does not establish as a matter of law that the appellant killed the deceased because he believed he was in eminent danger.

As stated in *Patterson v. State,* 253 S. C. 382, 171 S. E. (2d) 235 (1969) cert. denied, 397 U. S. 1069, 90 S. Ct. 1511, 25 L. Ed. (2d) 691:

One of the things a defendant has to affirmatively prove in a plea of self-defense is that the defendant believed that he was in danger of losing his own life or suffering serious bodily harm. It is difficult, if not impossible, to prove what a defendant "believes" unless he does take the stand and testify. Had he [the defendant] not testified he would apparently have been without even a semblance of a defense. 171 S. E. (2d) at 237.

Here, the appellant did not take the stand to testify in his own behalf but chose instead to rely on the other evidence introduced at trial to establish his defense. The testimony and other evidence created a factual question as to whether the appellant shot and killed the deceased in self-defense or

out of malice. The resolution of factual questions is solely within the province of the jury, not the court.

Additionally, in *State v. Graham,* 260 S. C. 449, 196 S. E. (2d) 495 (1973) we held on facts strikingly similar to these that the plea of self-defense was not available to a defendant where the circumstances of the killing amounted to mutual combat:

There was ill-will between the parties. They had threatened each other and it is inferable that they had armed themselves to settle their differences at gun point. Under these circumstances, the apparent willingness of each to engage in an armed encounter with the other, sustained an inference that they were engaged in mutual combat at the time of the killing, and required that the issue be submitted to the jury for determination. 196 S. E. (2d) at 496.

The testimony and other evidence created a question of fact for the jury and the trial judge correctly denied appellant's motion for a directed verdict.

I would affirm.

GRIMBALL, Acting Associate Justice, concurs.