669 S.E.2d 917

**The STATE, Respondent,**

v.

**Jason Michael DICKEY, Appellant.**

**No. 4451.**

Court of Appeals of South Carolina.

Heard Oct. 7, 2008.
Decided Oct. 29, 2008.
Rehearing Denied Dec. 19, 2008.

Laura C. Tesh, of Columbia and Lourie A. Salley, of Lexington, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, Office of the Attorney General and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

WILLIAMS, J.

Jason Michael Dickey was convicted of voluntary manslaughter after he shot and killed Josh Boot on the sidewalk outside the apartment building where Dickey lived and worked as a security guard. Dickey makes several arguments on appeal. We affirm.

## FACTS

In April 2004, Dickey was working as the night watchman at the Cornell Arms apartments in Columbia, where he also resided. Although not required by his employer for his duties, Dickey carried a loaded pistol, for which he held a valid permit.

On April 29, 2004, Boot and Alex Stroud (Stroud) were tailgating outside a Jimmy Buffett concert at the Colonial Center, a few blocks from the Cornell Arms apartments. According to Stroud, Boot consumed approximately twenty beers and several shots of liquor that evening. Stroud and Boot met two ladies outside the concert, Amanda McGariggle (McGariggle) and Tara West (West), both of whom resided at the Cornell Arms apartments. After a few hours of drinking together outside the Colonial Center, Boot and Stroud accompanied the two ladies back to their apartment. While West and Stroud adjourned to West's bedroom, Boot and McGariggle remained on the sofa in the living room of the apartment. As they sat on the sofa, apparently close to an open window, a neighbor from the sixth floor threw a water balloon[1] down

---

1. The record indicates that the ladies and their neighbors were in the practice of tossing water balloons at each other's apartments as part of an ongoing "joke."

into the ladies' apartment, splashing Boot. Boot became angry and stormed out of the apartment. He then went upstairs to the floors above and began randomly knocking on the doors of other tenants.

At this point, McGariggle went to the lobby and asked Dickey, who was the security guard on duty that night, to evict Boot from her apartment. Dickey came to the apartment where he found Boot upset and intoxicated. Dickey told Boot to leave or else he would call the police. Boot was indignant, hurling obscenities and insults at Dickey and making physical threats to him as he slammed the door to the apartment. According to West and McGariggle, Dickey looked angry during the encounter but remained calm and did not try to threaten or grab Boot. As he stood outside the door, Dickey proceeded to call the police to report the disturbance.

Meanwhile, back in the apartment, Stroud calmed Boot down and convinced Boot they should leave. As the two exited the apartment, they passed Dickey in the hallway. According to Stroud, Dickey and Boot "stared each other down," but no words were exchanged. Boot and Stroud took the elevator down to the lobby while Dickey took the stairs down to meet them. As Boot and Stroud walked to the front door to exit, Dickey followed behind them. Again, no words were exchanged. Boot and Stroud exited the building. Dickey followed the two out the building, stood on the Cornell Arms front doormat, and watched them walk away. Boot then turned around and walked back in the direction of Dickey.

At this point, the testimony of the witnesses varies substantially. Stroud testified he was "right beside" Boot as Boot advanced towards Dickey and asked Dickey, "[W]hy the f——was he following [them]?" Stroud then stated when Boot turned around to say something towards Dickey, Dickey shot Boot three times. Dickey, on the other hand, testified the two turned towards him and made threats they were going to "kick his a——," and called him a "fat f——" among other things. Dickey testified he told them, again, he just wanted them to leave. Dickey stated he was afraid and felt "[he] was outnumbered and [he] realized they were covering ground too fast for [him] to get back in the building." Dickey went on to say he reached into his pocket and exposed his pistol, causing

both men to stop advancing temporarily. Dickey then claimed Boot said, "f— it, let's do it," and reached under his shirt and stepped toward Dickey. Believing Boot to have a concealed weapon under his shirt, Dickey fired three shots, killing Boot.

Immediately, Dickey called 911. When the police arrived, Dickey told the officer about his pistol and that he had a concealed weapon permit. Dickey told the officer he shot Boot after Boot had come at him with a bottle he had hidden under his shirt. Crime scene investigators found a broken liquor bottle near the scene of the shooting with a smear of Boot's blood on it.

Dickey was indicted for murder and tried before a jury in September 2006. At the close of the State's evidence, defense counsel moved for a directed verdict of acquittal on the ground of self-defense. The motion was denied. Defense counsel renewed the motion for directed verdict at the close of all evidence. Thereafter, the trial court instructed the jury on murder, voluntary manslaughter, and self-defense. After the trial court charged the jury, defense counsel argued the trial court did not adequately charge the jury on either the right to act on appearances or the duty to retreat and objected to the refusal to charge the requested instructions on curtilage. During the instruction on voluntary manslaughter, the trial judge stated to the jury:

> By way of illustration, and I would point out this is by illustration alone, that if an unjustifiable assault is made with violence with the circumstances of indignity upon a man's person and the party so assaulted kills the aggressor the crime will be reduced to manslaughter.

The jury returned a verdict of voluntary manslaughter. Dickey was sentenced to sixteen years imprisonment.

## ISSUES

A.  Whether the trial court erred in refusing to grant a directed verdict that Dickey acted in self defense as a matter of law?

B.  Whether the trial court, in its instructions on self-defense, properly charged the jury on curtilage, the duty to retreat, and the right to act on appearances?

C. Whether the trial court erred in charging the jury on voluntary manslaughter in light of the evidence presented at trial?

D. Whether the trial court's "illustration" to the jury of voluntary manslaughter was an improper comment on the facts?

E. Whether the trial court erred in refusing to retroactively apply the "Stand Your Ground" law to this case?

## STANDARD OF REVIEW

In criminal cases, this Court reviews errors of law only. *State v. Miller*, 375 S.C. 370, 378, 652 S.E.2d 444, 448 (Ct.App. 2007). Thus, we are bound by the trial court's factual findings unless they are clearly erroneous. *Id.*

## LAW/ANALYSIS

### A. Directed Verdict of Self–Defense as a Matter of Law

■ Dickey argues under *State v. Hendrix*, 270 S.C. 653, 244 S.E.2d 503 (1978), the trial court should have directed a verdict of acquittal because the State failed to provide evidence to negate his claim of self-defense as a matter of law. We disagree.

■ The basic definition of when a person is justified in using deadly force in self-defense is comprised of four elements:

(1) That he was without fault in bringing on the difficulty, (2) That he actually believed he was in imminent danger of losing his life or of sustaining serious bodily injury [ ], or he actually was in imminent danger of losing his life or of sustaining serious bodily injury, (3) If his defense is based on his actual belief of imminent danger, that a reasonable prudent man of ordinary firmness and courage would have entertained the same belief [ ], or if his defense is based on his being in actual and imminent danger, that the circumstances were such as would warrant a man of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm, or losing his own life, (4) That

he had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in the particular instance.

*Id.* at 657–58, 244 S.E.2d at 505–06 (internal citations omitted).

At one time, self-defense was an affirmative defense in this State, and a defendant bore the burden of establishing it by a preponderance of the evidence. *State v. McDowell,* 272 S.C. 203, 207, 249 S.E.2d 916, 918 (1978). However, current law requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt. *State v. Wiggins,* 330 S.C. 538, 544, 500 S.E.2d 489, 492–493 (1998).

When this Court reviews the denial of a motion for a directed verdict, it views the evidence in the light most favorable to the non-moving party. *State v. Long,* 325 S.C. 59, 62, 480 S.E.2d 62, 63 (1997). When ruling on a motion for directed verdict, the trial judge is concerned with the existence of evidence, not its weight. *Id.* If there is any direct or substantial circumstantial evidence which reasonably tends to prove the guilt of the accused or from which guilt may be fairly and logically deduced, it is the trial court's duty to submit the case to the jury. *Id.* In other words, if the State provided evidence sufficient to negate Dickey's claim of self-defense, Dickey's motion for directed verdict was properly denied.

The State provided such evidence. First, the State provided evidence which, if believed, tended to show Dickey was not without fault in bringing on the difficulty. Any act of an accused that is reasonably calculated to produce the occasion amounts to bringing on the difficulty and bars the right to assert self-defense. *State v. Slater,* 373 S.C. 66, 70, 644 S.E.2d 50, 52 (2007). Additionally, the plea of self-defense is not available to one who kills another in mutual combat. *State v. Graham,* 260 S.C. 449, 450, 196 S.E.2d 495, 495 (1973). In this case, a jury could have found that Dickey's decision to exit the building and brandish his loaded gun, after the confrontation between him and Boot inside the apartment had all but ended, was an act that was reasonably calculated to provoke a new altercation with Boot, and that Dickey intended to engage in mutual combat.

■ Second, the State provided evidence that, if believed, tended to show Dickey had other probable means of avoiding the danger than to act as he did (i.e., that Dickey had a duty to retreat). Under the Castle Doctrine, "one attacked, without fault on his own part, on his own premises, has the right in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense." *State v. Hewitt*, 205 S.C. 207, 212, 31 S.E.2d 257, 258 (1944). In this case, Dickey was not immune from the duty to retreat under the Castle Doctrine. It is undisputed that Dickey was not inside the apartment building at the time he shot Boot, nor was he within the curtilage of the building.[2] Rather, he was standing on a **public** sidewalk outside the apartment building. He was, therefore, not immune as a matter of law under the Castle Doctrine.

### B. Sufficiency of Jury Instructions on Self—Defense

■ A trial court has a duty to give a requested instruction that correctly states the law applicable to the issues and is supported by the evidence. *State v. Peer*, 320 S.C. 546, 553, 466 S.E.2d 375, 380 (Ct.App.1996). To warrant reversal, a trial court's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. *State v. Hughey*, 339 S.C. 439, 450, 529 S.E.2d 721, 727 (2000). If the instructions given to the jury afford the proper test for determining the issues, the failure to give one side's requested instructions is not prejudicial. *Id.* at 452, 529 S.E.2d at 728.

### i. Curtilage

■ Dickey argues the trial court erred in refusing to charge the jury on curtilage. We disagree.

■ A defendant has no duty to retreat when attacked in his home or at his place of business. *Wiggins*, 330 S.C. at 548 n. 15, 500 S.E.2d at 494 n. 15. This rule of immunity extends to the curtilage of the building as well. Id. Curtilage includes outbuildings, the yard around the dwelling, a garden of a dwelling, or the parking lot of a business. Id. The common denominator between these places that are consid-

---

2. A discussion of curtilage follows.

ered curtilage is they are places where the property owner alone has the right to be, to the exclusion of the general public. *See State v. McGee*, 185 S.C. 184, 191, 193 S.E. 303, 306 (1937) (holding duty to retreat applies on a public highway, "where all men have equal rights"); *State v. Rochester*, 72 S.C. 194, 197, 51 S.E. 685, 686 (1905) ("A man on his own premises has a greater right there than anybody else."). They are not considered curtilage simply because they are close to the building or maintained by the owner. *State v. Boyd*, 126 S.C. 300, 302, 119 S.E. 839, 840 (1923) (holding one charged with assault and battery with intent to kill cannot defend on the ground that the Castle Doctrine extends to the middle of the street in front of the defendant's house).

In this case, it is undisputed Dickey was on the doormat outside the front door to the Cornell Arms apartments at the time he shot Boot. The doormat was placed away from the threshold of the entrance to the building, on the public sidewalk.[3] Although Dickey makes a colorable argument this portion of the sidewalk should be treated as curtilage of the apartment building,[4] the current law in this state does not include adjacent public sidewalks or public streets as curtilage such that the duty to retreat would be excused. *See McGee*, 185 S.C. at 184, 193 S.E. at 306 (rejecting defendant's argument he had no duty to retreat in his car on a public street). Other jurisdictions have similarly refused to hold there is no duty to retreat from a sidewalk in front of a business or residence. *See, e.g., State v. Menser*, 222 Neb. 36, 382 N.W.2d 18, 20 (1986) (holding a sidewalk outside defendant's apartment house was not part of defendant's "dwelling" within the meaning of law of self-defense); *State v. Provoid*, 110 N.J.Super. 547, 554, 266 A.2d 307, 311 (1970) (noting the curtilage of

---

**3.** At oral argument, counsel for Dickey argued the front mat was located in an "indentation," away from the sidewalk, such that the front edge of the doormat was flush with the front of the building and therefore not on the sidewalk. However, photos taken at the crime scene do not corroborate this.

**4.** Dickey argues the shooting occurred on the curtilage of the apartment building because the sidewalk was covered by the building's awning; Dickey was on the front door mat when the shooting occurred; Cornell Arms owned both the doormat and the awning; and Cornell Arms maintained the flower beds and benches on the sidewalk.

one's residence does not extend to a public thoroughfare running along the boundary of one's property). Unlike an outbuilding, yard or parking lot next to a building, the sidewalk is public land from which Dickey would not have had "the right to eject his adversary." *Rochester*, 72 S.C. at 203, 51 S.E. at 688. Because the sidewalk was not within the curtilage of the apartment building, Dickey was not immune from the duty to retreat. Therefore, the trial court's refusal to instruct the jury on the law of curtilage was not error.

### ii. Defendant's Right to Act on Appearances

■ Dickey next argues the trial court's instruction to the jury on the right to act on appearances was inadequate. We disagree.

■ A jury charge is correct if, when the charge is read as a whole, it is substantially correct and adequately covers the law. *State v. Foust*, 325 S.C. 12, 16, 479 S.E.2d 50, 52 (1996). Regarding the right to act on appearances, the Supreme Court has held:

> The test is not whether there was testimony of an intended attack but whether or not the appellant believed he was in imminent danger of death or serious bodily harm, and he is not required to show that such danger actually existed because he had a right to act upon such appearances as would cause a reasonable and prudent man of ordinary firmness and courage to entertain the same belief.

*State v. Jackson*, 227 S.C. 271, 279, 87 S.E.2d 681, 684 (1955).

In this case, the trial court instructed the jury on the second and third elements of self-defense as follows:

> In deciding whether the defendant was or believed that he was in imminent danger of death or serious bodily injury you should consider all of the facts and circumstances surrounding the offense including the physical condition and the characteristics of the defendant and the victim ... [I]t does not have to appear that the defendant believed that he was actually in danger. It is enough that the defendant believed that he was in imminent danger and a reasonably prudent person of ordinary firmness and courage would have had the same belief. A defendant has the right to act

on appearances even though the defendant's belief may have been mistaken.

Given the similarity between these two statements of the law, the trial court sufficiently instructed the jury on the right to act on appearances.

### iii. Duty to Retreat

Although the trial court did instruct the jury on the duty to retreat, Dickey argues the charge was inadequate. We disagree.

Despite the fact that Dickey was not within the curtilage at the time of the shooting, one may still satisfy the fourth prong of self-defense if he had no other probable means of avoiding the danger than to act as he did in the situation. *Hendrix*, 270 S.C. at 658, 244 S.E.2d at 506. Here, Dickey presented evidence that, if believed, could have supported a finding that retreat would have increased the danger to him. Had he retreated back into the apartment's first set of heavy front doors, he would have encountered the locked interior doors to the lobby. If his assailants had then followed him in, he could have been trapped in an enclosed space, thereby increasing his risk of peril from what it would have been had he stood his ground outside. Because this evidence, if believed, could have supported a finding of no duty to retreat, Dickey was entitled to a charge on the duty to retreat.

The trial court instructed the jury on the duty to retreat as follows:

Regardless of whether a defendant is on personal premises or business premises, . . . a defendant has no duty to retreat if by doing so the danger of being killed or suffering serious bodily injury would increase . . . [I]f both parties are where they have a right to be there is a duty to retreat unless retreating, in doing so the danger of being killed or suffering serious bodily injury would increase.

Because this charge, when read as a whole, was substantially correct and adequately covers the law, it was a proper instruction on the duty to retreat. *Foust*, 325 S.C. at 16, 479 S.E.2d at 52.

## C. Voluntary Manslaughter Charge

### i. Preservation of Error

The State argues the charge of voluntary manslaughter was not properly objected to by defense counsel and, therefore, the issue is not available for appellate review. We disagree.

If a party fails to properly object, the party is procedurally barred from raising the issue on appeal. *State v. Pauling*, 322 S.C. 95, 100, 470 S.E.2d 106, 109 (1996). A proper objection should be sufficiently specific to bring into focus the precise nature of the alleged error so that it can be reasonably understood by the trial court. *State v. Wigington*, 375 S.C. 25, 35–36, 649 S.E.2d 185, 190 (Ct.App.2007).

At the conclusion of the instructions to the jury, defense counsel stated his objection to the charge on voluntary manslaughter as, "We do not think [the instruction on voluntary manslaughter] was appropriate with the facts and circumstances in the case." The State argues this objection was not sufficiently specific to preserve the issue for appellate review. While defense counsel could have made a more specific objection, the objection made it sufficiently clear to the trial court that defense counsel did not believe the evidence supported a charge of voluntary manslaughter. Because the objection brought to the trial court's attention the precise nature of the alleged error, the issue is properly preserved for our review.

### ii. Propriety of the Charge

Dickey argues the trial court erred in instructing the jury on voluntary manslaughter because no evidence was presented from which the jury could have reasonably concluded he acted "in the heat of passion." We disagree.

The law to be charged must be determined from the evidence presented at trial. *State v. Lee*, 298 S.C. 362, 364, 380 S.E.2d 834, 835 (1989). In determining whether the evidence requires a charge on voluntary manslaughter, this Court must view the facts in the light most favorable to the defendant. *State v. Byrd*, 323 S.C. 319, 321, 474 S.E.2d 430, 431 (1996). For a court to refuse to charge a jury on manslaughter, there must be no evidence in the record tend-

ing to reduce the crime from murder to manslaughter. *State v. Lowry*, 315 S.C. 396, 399, 434 S.E.2d 272, 274 (1993).

Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. *State v. Kornahrens*, 290 S.C. 281, 285–86, 350 S.E.2d 180, 184 (1986). Evidence of acting in the heat of passion alone will not suffice to reduce murder to voluntary manslaughter. *State v. Walker*, 324 S.C. 257, 260, 478 S.E.2d 280, 281 (1996). Rather, both heat of passion and sufficient legal provocation must be present at the time of the killing. *State v. Tyson*, 283 S.C. 375, 379, 323 S.E.2d 770, 772 (1984). To mitigate a felonious killing to manslaughter, the sudden heat of passion "must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence." *State v. Byrd*, 323 S.C. 319, 322, 474 S.E.2d 430, 432 (1996) (internal quotations omitted).

Even assuming[5] adequate legal provocation by Boot, Dickey argues there was no evidence presented at trial from which the jury could have found he acted in the heat of passion at the time he shot Boot that would support the voluntary manslaughter charge. Dickey points to witness testimony indicating he "remained calm," "did not ever touch Boot," "did not mouth off in return," and "had no prior bad feelings or ill will [towards Boot]." In contrast, the heat of passion is an uncontrollable impulse to do violence, which renders the mind incapable of cool reflection. *Byrd*, 323 S.C. at 322, 474 S.E.2d at 432. Thus, Dickey argues he did in fact remain calm and in control, which necessarily means he was not acting in the heat of passion at the time of the shooting.

In essence, Dickey's position is that, in view of the evidence presented, the only emotion he was experiencing at the time

5. In his brief, Appellant has phrased his argument as: "[M]anslaughter is not a valid verdict where Dickey was not acting in the heat of passion." He does not dispute the finding of adequate legal provocation. His argument on appeal is therefore limited to whether Dickey was in the heat of passion. An issue that is not argued in the brief is deemed abandoned and precludes consideration on appeal. Rule 208(b)(1)(D), SCACR; *Jinks v. Richland County*, 355 S.C. 341, 344 n. 3, 585 S.E.2d 281, 283 n. 3 (2003).

he shot Boot was **fear.** Dickey correctly points out that fear for one's safety is a necessary prong of self-defense. *Hendrix,* 270 S.C. at 657–58, 244 S.E.2d at 505–506. Therefore, Dickey argues, if simply being afraid amounts to being in the heat of passion for purposes of voluntary manslaughter, the line separating it from self-defense would be blurred under such an interpretation. To reconcile this, Dickey argues there must exist some legal difference between the type of reasonable fear that would support a self-defense claim on the one hand, and the type of fear that would support a verdict of voluntary manslaughter on the other. Dickey argues the latter type is "fear that causes a person to lose control of himself temporarily," and because the evidence did not support a finding of this latter type of fear, he was not acting in the heat of passion. Thus, the charge was improper.

However, it is well settled that self-defense and voluntary manslaughter are not mutually exclusive, and both issues should be submitted to the jury if supported by the evidence. *Wiggins,* 330 S.C. at 549 n. 18, 500 S.E.2d at 495 n. 18; *State v. Nichols,* 325 S.C. 111, 118, 481 S.E.2d 118, 122 (1997); *State v. Gilliam,* 296 S.C. 395, 396, 373 S.E.2d 596, 597 (1988). The rationale for this rule is that the jury may fail to find all the elements for self-defense but could find sufficient legal provocation and heat of passion to conclude the defendant was guilty of voluntary manslaughter. *Gilliam,* 296 S.C. at 396–97, 373 S.E.2d at 597. Furthermore, contrary to Dickey's argument, fear can constitute a basis for heat of passion to support voluntary manslaughter. *See Wiggins,* 330 S.C. at 549, 500 S.E.2d at 495 (holding when evidence showed appellant was in a heated argument with the victim and was afraid for his life because victim physically threatened him, such evidence, if believed, would tend to show appellant acted in sudden heat of passion).

In this case, ample evidence was introduced that would support a finding of heat of passion. Dickey and Boot engaged in a heated argument before the shooting and Boot verbally threatened Dickey. Evidence of arguments and physical threats prior to a homicide can support a charge of manslaughter. *See Lowry,* 315 S.C. at 399, 434 S.E.2d at 274 (holding it was an error for trial court to refuse to charge on

manslaughter when there was testimony which, if believed, tended to show that the decedent and the defendant were in a heated argument and that the decedent was about to initiate a physical encounter when the shooting occurred). Dickey also testified Boot came at him in a threatening manner, reaching under his shirt for what could have been a weapon, and said to Dickey, "F—— it, let's do it." Taken together, these could support a finding that Dickey was in the heat of passion. *See Gilliam*, 296 S.C. at 397, 373 S.E.2d at 597 ("Appellant's testimony that the victim threatened him and then fired at him would support a finding of sufficient legal provocation and heat of passion.").

### D. Trial Judge's "Illustration" of Voluntary Manslaughter

■ Dickey argues the trial court's illustration during his instructions to the jury on voluntary manslaughter was an improper comment on the facts of the case. We disagree.

■ Article V, § 21 of the South Carolina Constitution states: "Judges shall not charge juries in respect to matters of fact, but shall declare the law." South Carolina law dictates a trial judge should refrain from any comment that tends to indicate to the jury his opinion on the credibility of witnesses, the weight of the evidence, or the guilt of the accused. *State v. Jackson*, 297 S.C. 523, 526, 377 S.E.2d 570, 572 (1989). However, jury instructions must be considered in their entirety and, if in their entirety are free from error, any potentially misleading portions do not constitute reversible error. *Id.*

■ "Oftentimes juries can be made to understand the law of the case easier if they are given helpful illustrations." *State v. Quick*, 141 S.C. 442, 447, 140 S.E. 97, 99 (1927). A charge that states the legal conclusions that would result from the establishment of certain facts is not necessarily an improper charge on the facts, nor a mandate to the jury to assume the truth of the facts as stated. *Williams v. Se. Life Ins. Co.* 197 S.C. 171, 177, 14 S.E.2d 895, 897 (1941). The test is how a reasonable juror would have understood the charge. *Sheppard v. State*, 357 S.C. 646, 664, 594 S.E.2d 462, 472 (2004).

Here, it is unlikely that a reasonable juror would have singled out the illustration portion of the charge and interpret-

ed it as the court's opinion on the facts of this case or as an instruction on the weight to be given to the evidence. First, the jury was reminded numerous times of its role as arbiter of the facts. Second, the trial court prefaced its illustration by making clear it was just an illustration. Third, the trial court's illustration took on the form: "If X, Y and Z occur, that constitutes manslaughter." He did not say, "X, Y and Z occurred." *See, e.g., State v. Smith*, 288 S.C. 329, 330–31, 342 S.E.2d 600, 601 (1986) (holding judge's instruction, "If the State proves [elements one through four], then the results of the test can be admitted into evidence and the jury to consider. **You have heard such evidence**" was error because a reasonable juror could have construed that the trial judge felt the State had met its burden of proof on the required elements) (emphasis added). In this case, the trial court's illustration was an explanation, not commentary. Taken as a whole, the instructions were not erroneous.

### E. Retroactive Application of "Stand Your Ground" Law

Dickey argues that the trial court should have applied the recently enacted Protection of Persons and Property Act (the Act) to his case. The Act has an effective date of June 9, 2006, and Dickey was charged with murder on April 29, 2004, and convicted of manslaughter on September 15, 2006.

### i. Preservation of Error

■ The State argues Dickey did not properly assert this argument to the trial court, and so it is not preserved for appellate review. We disagree.

An issue not presented to the trial court is not preserved for appellate review. *State v. Johnson*, 324 S.C. 38, 41, 476 S.E.2d 681, 682 (1996). *See also State v. Tucker*, 319 S.C. 425, 427–28, 462 S.E.2d 263, 264–65 (1995) (holding when defendant failed to object to a jury charge, issue is not preserved for consideration on appeal); *State v. Stone*, 285 S.C. 386, 387, 330 S.E.2d 286, 287 (1985) (holding defendant's failure to object to charge as given, or to request an additional charge when the opportunity to do so has been afforded, waived the right to complain on appeal); *State v. Rogers*, 361 S.C. 178, 183, 603

S.E.2d 910, 912–13 (Ct.App.2004) (holding that to preserve an issue for appellate review, the issue must have been raised to and ruled upon by the trial court, raised by the appellant, raised in a timely manner, and raised to the trial court with sufficient specificity).

Defense counsel in this case argued before the trial court, on the record, that the trial court should apply the Act to this case. Thereafter, the trial court heard opposing argument from the State on this same issue. After hearing from both parties on the issue, the trial court ruled on the issue, stating: "I think it was clearly the intent of the legislature, that . . . this [A]ct does not apply to pending criminal prosecution. For that reason that is the court's ruling." The issue was timely raised on the record and ruled upon by the trial court and is, therefore, preserved for review.

### ii. Retroactive Application

Dickey argues the trial court erred in refusing to apply the Act to this case. We disagree.

The retrospective operation of a statute is not favored by the courts, and statutes are presumed to be prospective in effect. *State v. Davis*, 309 S.C. 326, 334, 422 S.E.2d 133, 139 (1992), *overruled on other grounds by Brightman v. State*, 336 S.C. 348, 352 n. 2, 520 S.E.2d 614, 616 n. 2 (1999). The Supreme Court has recognized that "[a] statute is not to be applied retroactively unless that result is so clearly compelled as to leave no room for doubt." *Am. Nat. Fire Ins. Co. v. Smith Grading & Paving*, 317 S.C. 445, 449, 454 S.E.2d 897, 899 (1995). The exception to this rule of prospective operation is where the statute is remedial or procedural in nature. *Hercules, Inc. v. S.C. Tax Comm'n*, 274 S.C. 137, 143, 262 S.E.2d 45, 48 (1980).

Dickey argues the Act should be applied retroactively because it is procedural in nature. We disagree.

The Act, by codifying the common law Castle Doctrine, creates substantive rights for citizens. The Act "extends the [Castle] doctrine to include an occupied vehicle and the person's place of business." [6] The Act also gives citizens the right

---

6. S.C.Code Ann. § 16–11–420(A) (2006).

"to protect themselves, their families and others from intruders and attackers without fear of prosecution or civil action."[7] Therefore, because the rights are substantive, the Act will only operate retroactively if there is a clear indication from the legislature that this was intended. *Am. Nat. Fire,* 317 S.C. at 449, 454 S.E.2d at 899. There is no such indication in the Act. The Act specifically states it was not effective until approved by the Governor, which occurred on June 9, 2006. 2006 S.C. Act No. 379 § 6. This effective date was over two years after the shooting at the Cornell Arms Apartments. Additionally, section 4 of the Act provides the following savings clause:

> The repeal or amendment by this act of any law, whether temporary or permanent, civil or criminal, does not affect pending actions, rights, duties, or liabilities founded thereon, or alter, discharge, release or extinguish any penalty, forfeiture, or liability incurred under the repealed or amended law, unless the repealed or amended provision shall so expressly provide. After the effective date of this act, all laws repealed or amended by this act must be taken and treated as remaining in full force and effect for the purpose of sustaining any pending or vested right, civil action, special proceeding, criminal prosecution, or appeal existing as of the effective date of this act, and for the enforcement of rights, duties, penalties and forfeitures, and liabilities as they stood under the repealed or amended laws.

Here, the Legislature clearly manifested its intent that the Act be applied prospectively. As such, the fact that Dickey's prosecution was pending before the effective date of the Act precludes the application of the Act to this case.

## CONCLUSION

Accordingly, the trial court's decision is
**AFFIRMED.**

ANDERSON and KONDUROS, JJ., concur.

---

7. S.C.Code Ann. § 16–11–420(B) (2006).