716 S.E.2d 97

**The STATE, Respondent,**

v.

**Jason Michael DICKEY, Petitioner.**

No. 27047.

Supreme Court of South Carolina.

Heard March 2, 2011.

Decided Sept. 26, 2011.

Rehearing Denied Oct. 18, 2011.

492

494

Lourie A. Salley III, of Lexington, for Petitioner.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Christina J. Catoe, and Daniel E. Johnson, all of Columbia, for Respondent.

Chief Justice TOAL.

Jason Michael Dickey (Petitioner) appeals the court of appeals' decision affirming his conviction of voluntary man-. slaughter. *State v. Dickey*, 380 S.C. 384, 669 S.E.2d 917

(Ct.App.2008). We find Petitioner was entitled to a directed verdict on the issue of self-defense. Therefore, we reverse.

## FACTUAL/PROCEDURAL BACKGROUND

In April 2004, Petitioner was employed as a security guard at Cornell Arms apartments in Columbia, where he also resided. Although not required by his employer for his duties, Petitioner carried a loaded pistol, for which he held a valid concealed weapons permit.

On April 29, 2004, Joshua Boot and his friend, Alex Stroud, met Amanda McGarrigle and Tara West while tailgating at a Jimmy Buffet concert. After several hours of heavy drinking, Boot and Stroud accompanied McGarrigle and West, who were roommates, back to their apartment at Cornell Arms. Stroud testified Boot was "pretty intoxicated" and had consumed up to twenty beers and several shots of tequila throughout the day. As McGarrigle and Boot sat on the couch in her apartment, a neighbor threw a water balloon through an open window, splashing Boot. The water balloon tossing was part of an ongoing joke between neighbors. However, the prank so angered Boot that he threatened to physically assault the person who splashed him.[1] Fearful of trouble, McGarrigle asked Boot to leave the apartment, and Boot refused. He instead went to find the culprit, in what McGarrigle described as an aggressive, angry manner. Boot began banging on neighbors' doors, which prompted McGarrigle to go to the security desk, where Petitioner was on duty, and ask Petitioner to evict her guest. McGarrigle, Petitioner, and McGarrigle's friend, Morteza Safaie, whom she met along the way, searched for Boot on several floors and eventually found him back in her apartment. Boot stepped outside into the hall and Petitioner identified himself as the security guard on duty and asked Boot to leave. According to Safaie and McGarrigle, who were standing in the hallway, Boot responded by shouting expletives at Petitioner and telling him "he couldn't make him do anything," then re-entering the apartment and slamming the door. Petitioner knocked on the door and again asked Boot to leave, without making any threatening comments or

---

[1]. Stroud did not witness or hear any commotion concerning the water balloon because he was in West's bedroom at the time.

gestures or raising his voice. Boot again slammed the door in Petitioner's face. According to Stroud, who, at this point, had come out of West's bedroom, stated that Boot was "awfully" angry and Petitioner seemed "pretty unhappy." While standing outside the door to the apartment, Petitioner called the Columbia police to report the disturbance, and then asked McGarrigle and Safaie to go downstairs to let the officers inside the building. Meanwhile, inside the apartment, Stroud attempted to calm Boot and eventually convinced him they should leave. West witnessed Boot tuck a liquor bottle in his shorts before he exited the apartment.[2]

As Boot and Stroud walked toward the elevator, Petitioner kept his distance and the parties did not exchange words. However, Stroud testified Boot and Petitioner were "staring each other down." Petitioner chose not to ride with Stroud and Boot in the elevator, instead opting to take the stairs. The silence continued in the lobby as Petitioner followed several feet behind the men while they walked toward the exit. Petitioner testified that he noticed a Crown Victoria pass by the lobby windows and thought the police had arrived. He stated he followed Boot and Stroud outside so he could inform the police of the direction they were walking. According to Stroud, Petitioner stood in the vicinity of the Cornell Arms doormat watching them silently as they walked toward Sumter Street. Kristy Ann Murphy witnessed the scene from a bench located in front of the Cornell Arms doorway. She testified that Petitioner asked the men to leave in an unthreatening manner, while Boot shouted obscenities at Petitioner. Stroud testified that the derogatory comments Boot made about Petitioner were directed to Stroud only. After walking halfway down the block, Stroud turned around first and asked Petitioner, "[W]hy the f—— [are you] following [us]." Stroud testified that Petitioner just stood there, making no gestures or comments. Boot and Stroud then turned and started walking towards Petitioner quickly. Petitioner testified Boot threatened to "whip [his] a——." Stroud testified he made at most two steps, while Boot took two or three big steps, placing Boot nearer to Petitioner than Stroud. Stroud testified further that as Boot advanced toward Petitioner, he was in the

---

2. Stroud did not see Boot pick up a bottle, but noticed a fifth of vodka on the coffee table earlier in the night.

mood to fight and planned to harm Petitioner. Petitioner, in turn, testified the two men were covering ground very quickly and if he turned his back he was afraid of being attacked from behind with no way to defend himself.[3] When Boot was approximately fifteen feet away, Petitioner pulled a gun from his pocket. Petitioner testified he pulled the gun to discourage the two men from attacking him. Stroud took a few steps back at the sight of the gun, but Boot continued to advance toward Petitioner in an aggressive manner. Petitioner testified he saw Boot reach under his shirt as he continued forward, and Petitioner feared he was reaching for a weapon.[4] Without warning, Petitioner fired a shot, striking Boot. After the first shot, Boot took another step toward Petitioner. Petitioner's second shot stopped Boot. Petitioner then fired a third shot as Boot dropped to his knees. Petitioner immediately put the gun back in his pocket and called 911.

The first officer to arrive at the scene heard the three shots. As soon as the officer exited his vehicle, Petitioner stated, "I shot him, I am security for the building. I have a concealed weapons permit, and the gun is in my right front pants pocket. I didn't have a choice. He came at me with a bottle." Investigators found a broken liquor bottle at the scene with a blood smear on the neck of the bottle matching Boot's DNA. According to the State's expert witness, smearing can occur when someone picks up an object or brushes against something.

---

3. Boot was six feet, one inch tall and weighed between 200 and 210 pounds. Petitioner was five feet, eleven inches tall, and weighed 275 pounds. In 2001, the Veteran's Affairs Administration classified Petitioner as thirty percent disabled after he was diagnosed with patella syndrome and underwent several corrective operations, leaving his right foot partially paralyzed. Due to this disability, Petitioner testified he was unable to run. Furthermore, two sets of double doors blocked his entry into Cornell Arms. The first set of doors open into a breezeway and were not locked. However, the second set of doors could only be opened with a key because they locked at 5:00 p.m. each night for security reasons. At the time of death, Boot had a blood alcohol level of .203, over twice the legal limit.

4. Stroud testified he did not see anything in Boot's hands when he fell. However, Stroud was behind Boot as Boot advanced. Murphy, who at this point was hurrying to the door, fearful of an ensuing fight, stated she may have seen Boot reach under his shirt for something, but was unsure.

Subsequently, a Richland County grand jury indicted Petitioner for murder. At the beginning of Petitioner's September 2006 trial, his counsel moved for the dismissal of Petitioner's murder charge pursuant to the recent enactment of the "Protection of Persons and Property Act," which codified the common law Castle Doctrine. S.C.Code Ann. § 16–11–410 (Supp.2010). The circuit judge denied the motion, finding the Act did not apply to pending criminal cases. Petitioner's counsel twice moved for a directed verdict of acquittal on the ground that Petitioner was acting in self-defense when he shot Boot. The circuit judge denied both motions.

The circuit judge charged the jury on the crimes of murder and voluntary manslaughter, and on the affirmative defense of self-defense. Petitioner's counsel objected to the voluntary manslaughter charge, arguing there was no evidence to support this charge. Petitioner's counsel additionally challenged that the judge's self-defense instructions were inadequate. The circuit judge denied these motions, and the jury convicted Petitioner of committing voluntary manslaughter. The circuit judge sentenced Petitioner to sixteen years' imprisonment. The court of appeals affirmed. *Dickey*, 380 S.C. at 384, 669 S.E.2d at 917. Specifically, the court held the circuit judge: (1) properly denied Petitioner's motion for acquittal on the ground of self-defense; (2) sufficiently instructed the jury on the law of self-defense; (3) correctly submitted the charge of voluntary manslaughter to the jury; (4) adequately instructed the jury regarding the charge of voluntary manslaughter; and (5) properly refused to retroactively apply the "Protection of Persons and Property Act" to Petitioner's case. This Court granted Petitioner's petition for a writ of certiorari. Petitioner appeals all of the grounds upon which the court of appeals affirmed his conviction. Finding Petitioner was entitled to a directed verdict of acquittal on the ground of self-defense, we reach that issue only. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (appellate court need not address remaining issues when disposition of prior issue is dispositive).

## Standard Of Review

In criminal cases, the appellate court only reviews errors of law and is clearly bound by the trial court's factual

 

findings unless the findings are clearly erroneous. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).

ANALYSIS

■■■ "A defendant is entitled to a directed verdict when the state fails to produce evidence of the offense charged." *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "If there is any direct or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the appellate court must find the case was properly submitted to the jury." *Id.* at 292–93, 25 S.E.2d at 648. However, when a defendant claims self-defense, the State is required to disprove the elements of self-defense beyond a reasonable doubt. *Wiggins*, 330 S.C. at 544–45, 500 S.E.2d at 492–93. We find the State did not carry that burden.

■■■ A person is justified in using deadly force in self-defense when:

(1) The defendant was without fault in bringing on the difficulty;

(2) The defendant . . . actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger;

(3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable prudent man of ordinary firmness and courage would have entertained the same belief . . . ; and

(4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*Id.* at 545, 500 S.E.2d at 493 (*citing State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984)).

### A. Fault in Bringing about the Harm

■■■ South Carolina recognizes a business proprietor's right to eject a trespasser from his premises. *State v. Brooks*, 252 S.C. 504, 510, 167 S.E.2d 307, 310 (1969) (*citing State v. Rogers*, 130 S.C. 426, 126 S.E. 329 (1925)). If the proprietor is "engaged in the legitimate exercise in good faith of his right to

eject, he would in such case be without fault in bringing on the difficulty, and would not be bound to retreat." *Id.* (*citing Rogers,* 130 S.C. at 426, 126 S.E. at 329). Therefore, to withstand a motion for directed verdict as to whether Petitioner, an agent of Cornell Arms, was at fault in bringing about the harm, the State had to disprove Petitioner's claim that he was ejecting Boot in good faith. Even viewing the facts in a light most favorable to the State, the State did not carry this burden.

The court of appeals stated that a jury could have reasonably found Petitioner's decision to exit the building "and brandish his loaded gun ... was an act reasonably calculated to provoke a new altercation with Boot...." However, the testimony is consistent that Petitioner was not brandishing[5] his gun when they were outside, but rather, he pulled the gun from its holster when Boot and Stroud turned and began advancing toward him in an aggressive manner. The State did not produce any evidence to contradict Petitioner's testimony he routinely carried the concealed weapon, and did not deliberately arm himself in anticipation of a conflict that evening. The record establishes Petitioner did not know Boot prior to his attempt to eject him and only did so in his capacity as a security guard, and upon request of a tenant. It is undisputed that Petitioner called the police before ejecting Boot and Stroud, and then immediately called 911 after firing the shots. Petitioner's stated reason for walking outside was to inform the police, whom he thought had arrived, of the direction Boot and Stroud were walking. The State did not rebut Petitioner's stated reason for his exit and, in fact, the only evidence the State offered to prove Petitioner's fault in bringing about the harm was the act of following Boot and Stroud outside. As Petitioner had the right to eject the trespassers from the premises, his decision to exit the building and stand on the doormat to ensure their departure cannot, in and of itself, be construed as acting in bad faith. Had Petitioner accompanied the ejection with threatening words or posture, a jury question may have arisen. *See State v. Wiggins,* 330 S.C. at 547, 500 S.E.2d at 494 (testimony that

---

5. Brandish is defined as "1. to shake or wave (as a weapon) menacingly 2. to exhibit in an ostentatious, shameless, or aggressive manner." *Webster's Third New International Dictionary* 268 (2002).

appellant threatened to "kick both [victim's and sister's] a—es" raised a jury question as to whether appellant was exercising good faith in ejecting victim). However, under these facts, we find Petitioner was exercising his right to eject trespassers in good faith and, as a matter of law, he was without fault in bringing about the difficulty.

## B. Subjective and Objective Belief of Imminent Danger

 We find that even the testimony most adverse to the defense, Stroud's testimony, established as a matter of law that Petitioner actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, and that a reasonable person of ordinary firmness would have entertained the same belief. "[W]ords accompanied by hostile acts may, depending on the circumstances, establish a plea of self-defense." *State v. Fuller*, 297 S.C. 440, 444, 377 S.E.2d 328, 331 (1989) (*quoting State v. Harvey*, 220 S.C. 506, 68 S.E.2d 409 (1951)). We believe such circumstances were present in this case. It is uncontroverted that Boot was highly intoxicated, acted aggressively over the course of the conflict, that he began advancing toward Petitioner quickly with the purpose of assaulting him, that he continued advancing toward Petitioner after Petitioner pulled the gun, and there was great disparity in the physical stature and capabilities of Boot and Petitioner. Furthermore, the State did not rebut Petitioner's testimony that he saw Boot reach under his shirt as he advanced. To the contrary, West testified she saw Boot place a bottle in his shorts as he left the apartment, and a broken bottle was found on the scene with Boot's blood smear on the neck.[6] Petitioner testified he did not see what Boot was reaching for when he fired the shots, but because Boot continued advancing after seeing the gun, Petitioner believed he was reaching for a deadly weapon. A person has the right to act on appearances, even if the person's belief is ultimately mistaken. *State v. Fuller*, 297 S.C. 440, 443–44, 377 S.E.2d 328, 331 (1989). "Once the right to fire in self-defense arises, a defendant is not required to wait until his adversary is on equal terms or until he has fired or aimed his weapon in order to act." *State*

---

**6.** Stroud's testimony that he did not notice Boot pick up a bottle when he left the apartment and did not see anything in Boot's hand after he fell did not affirmatively refute the claims of West and Dickey.

*v. Starnes,* 340 S.C. 312, 322, 531 S.E.2d 907, 913 (2000) (*citing State v. Hendrix,* 270 S.C. 653, 244 S.E.2d 503 (1978)). There is uncontroverted testimony that Petitioner acted upon the appearance that Boot had a deadly weapon.

Petitioner testified that, under the circumstances and appearances, he believed he was in actual danger of death or serious bodily harm. We find it reasonable that Petitioner made such an assumption and that a person of Petitioner's stature and limited agility would entertain the same fear when faced with an attack by a belligerent, intoxicated, more agile, and younger male, who appeared to be reaching for a weapon. The State certainly did not rebut these elements of self-defense beyond a reasonable doubt, as the law requires. Therefore, we find that as a matter of law, Petitioner actually believed he was in imminent danger of losing his life, or sustaining serious bodily injury, and that a reasonable person would have entertained the same belief.

### C. Duty to Retreat

A defendant is not required to retreat if he has "no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in [the] particular instance." *Wiggins,* 330 S.C. at 545, 500 S.E.2d at 493 The court of appeals found "the State provided evidence that, if believed, tended to show Petitioner had other probable means of avoiding the danger than acting as he did." However, the court never specified what evidence it relied on to support that finding. Instead, it focused on whether or not Petitioner was absolved of his duty to retreat under the Castle Doctrine. We do not think it necessary to determine whether curtilage can extend to a public sidewalk, because we find the State failed to disprove beyond a reasonable doubt that Petitioner had no other probable means of avoiding the danger.

As discussed previously, Petitioner was not at fault in bringing about the harm by exiting the building. Once outside, Petitioner was faced with a situation where two younger, intoxicated, and physically superior men were advancing toward him, one with the clear intent to assault him and who was undeterred at the sight of Petitioner's gun. Moreover, the State did not disprove Petitioner's testimony that Boot

reached for something under his shirt as he continued toward Petitioner. The testimony is consistent that Boot moved toward Petitioner at a fast pace. Had Petitioner turned his back, he would have likely been attacked from behind as he tried to get through the first set of glass doors. Even if he were able to pass through the first set of doors unscathed, he would likely have been trapped in the breezeway behind the second set of locked doors. Petitioner was classified as permanently disabled and testified that he could not run. Therefore, the uncontroverted facts establish as a matter of law that Petitioner had no other probable means of avoiding the danger other than to act as he did.

### Conclusion

For the reasons set forth above, we find the State failed to disprove the elements of self-defense beyond a reasonable doubt. Even viewing the facts in a light most favorable to the State, the evidence establishes that Petitioner shot and killed Boot in self-defense. Therefore, we reverse the court of appeals and overturn Petitioner's conviction.

**REVERSED.**

KITTREDGE and HEARN, JJ., concur. PLEICONES, J., concurring in a separate opinion. BEATTY, J., dissenting in a separate opinion.

Justice PLEICONES.

I concur, but would reverse on the ground the Court of Appeals erred in upholding the trial judge's decision to charge voluntary manslaughter. Moreover, were I to reach the issues, I would find reversible error in the unconstitutional jury charge on the facts, and I would find that while the evidence established the first three elements of self-defense as a matter of law, there was a jury issue whether petitioner was in the building's curtilage such that he had no duty to retreat. See *e.g., State v. Brooks,* 252 S.C. 504, 167 S.E.2d 307 (1969).

In my opinion, the dispositive issue here is that of the voluntary manslaughter charge. Taking the evidence in the light most favorable to the State, it shows that at the request of a tenant, petitioner located the combative, intoxicated victim and asked him to leave. Petitioner endured the victim's

obscenities, insults, and threats of physical violence calmly, and called the local police to report the incident. As the man began to leave the building, petitioner chose not to enter the elevator with him but instead took the stairway. Petitioner then followed the victim and his companion as they exited the building. As one would expect from a security guard who had just escorted such an individual off the premises, petitioner stood outside the building to make sure the men actually left the area. *Compare State v. Brooks, supra* (right to eject patron from business includes following patron outside).

When the victim and his friend turned and approached petitioner, petitioner felt "afraid" and "outnumbered," then shot the victim.

In my view, there is no evidence that petitioner was so angry and fearful that he lost control, and was rendered incapable of cool reflection. Instead, the evidence reflects that petitioner retained his composure despite the threats and language directed at him by the victim, and only shot when the victim and his friend turned back and approached petitioner outside the building whose occupants he was paid to guard. After the shooting, petitioner again called 911, and reported the events. I simply see no evidence of fear manifesting itself in an uncontrollable impulse to do violence. In my view, the only evidence is that petitioner, admittedly acting out of fear, nonetheless acted in a deliberate, controlled manner. As such, he could not, as a matter of law, be guilty of voluntary manslaughter. *State v. Starnes*, 388 S.C. 590, 698 S.E.2d 604 (2010).

I concur in the decision to reverse.

Justice BEATTY.

For reasons that will be discussed, I dissent as I would affirm the decision of the Court of Appeals and, in turn, Dickey's conviction for voluntary manslaughter.

In challenging the decision of the Court of Appeals, Dickey raises seven issues. In response to the divergent views of this Court, I have consolidated the issues under the following two headings: (1) self-defense, which, if found as matter of law, would be dispositive as to the charge of murder; and (2) voluntary manslaughter, a lesser-included offense of murder.

## I. Self–Defense

## A. Motion for a Directed Verdict of Acquittal

Dickey contends the Court of Appeals erred in finding the trial judge properly refused to direct a verdict of acquittal based on self-defense. In conjunction with his self-defense arguments, Dickey claims the Court of Appeals erred in failing to address whether a glass bottle should be considered a deadly weapon under South Carolina law as Dickey believed Boot was armed with a large glass bottle that could have been used to inflict serious bodily harm or death.

"A defendant is entitled to a directed verdict when the [S]tate fails to produce evidence of the offense charged." *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the appellate court must find the case was properly submitted to the jury. *Id.* at 292–93, 625 S.E.2d at 648. "When reviewing a denial of a directed verdict, this Court views the evidence and all reasonable inferences in the light most favorable to the [S]tate." *Id.* at 292, 625 S.E.2d at 648.

Once raised by the defense, the State must disprove self-defense beyond a reasonable doubt. *State v. Burkhart,* 350 S.C. 252, 261, 565 S.E.2d 298, 303 (2002). There are four elements required by law to establish a case of self-defense. *State v. Davis,* 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984). The four elements are:

First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he

did in this particular instance. If, however, the defendant was on his own premises he had no duty to retreat before acting in self-defense.

*Id.*; *State v. Hendrix,* 270 S.C. 653, 657–58, 244 S.E.2d 503, 505–06 (1978).

Under the Castle Doctrine, "[o]ne attacked, without fault on his part, on his own premises, has the right, in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense." *State v. Gordon,* 128 S.C. 422, 425, 122 S.E. 501, 502 (1924). Our appellate courts have recognized that the rule also applies to a person's place of business. *Id.*; *State v. Brooks,* 252 S.C. 504, 167 S.E.2d 307 (1969). The absence of a duty to retreat also extends to the curtilage of one's home or place of business. *State v. Wiggins,* 330 S.C. 538, 548 n. 15, 500 S.E.2d 489, 494 n. 15 (1998). Curtilage includes outbuildings, the yard around a dwelling, a garden of the dwelling, or the parking lot of a business. *Id.*

Applying the foregoing to the facts of the instant case, I find that all four elements of self-defense were not established as a matter of law to warrant a directed verdict. As to the first element of self-defense, a question of fact was created as to whether Dickey was without fault in bringing on the conflict. The State presented undisputed evidence that Dickey followed Boot and Stroud after they left the apartment building. Because Dickey could have remained inside behind the safety of the locked doors to wait for the police, there is evidence that Dickey could have avoided the fatal confrontation.

I disagree, however, with the Court of Appeals' finding that Dickey's actions were "reasonably calculated to provoke a new altercation with Boot, and that Dickey intended to engage in mutual combat." *Dickey,* 380 S.C. at 394, 669 S.E.2d at 923.

First, this ground was neither raised to the trial judge nor submitted to the jury. Secondly, the Court of Appeals appears to have found that mutual combat was established as a matter of law, which would have precluded Dickey's reliance on self-defense. See *State v. Taylor,* 356 S.C. 227, 232, 589 S.E.2d 1, 3 (2003) ("Whether or not mutual combat exists is significant because the plea of self-defense is not available to one who kills another in mutual combat." (citation omitted));

*State v. Graham*, 260 S.C. 449, 450, 196 S.E.2d 495, 495 (1973) ("To constitute mutual combat there must exist a mutual intent and willingness to fight and this intent may be manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat." (citation omitted)). In contrast to the Court of Appeals, I find there was a question of fact as to the requisite intent for the doctrine of mutual combat; thus, mutual combat could have been submitted to the jury. Accordingly, I believe the Court of Appeals' reference to this doctrine was harmless as it did not negate the court's correct finding regarding the first element of self-defense.

In terms of the second and third elements, i.e., Dickey's belief that he was in imminent danger of losing his life or sustaining serious bodily injury, the State presented evidence to create a question of fact as to the "reasonableness" of Dickey's belief that he needed to shoot Boot.

First, the evidence was disputed as to whether Boot was in possession of a deadly weapon and whether he was reaching for one prior to the shooting. Although there is case law to support Dickey's assertion that the glass bottle constituted a deadly weapon, I note that this issue was neither raised to nor ruled upon by the trial judge. Thus, it was not properly preserved for appellate review. See *State v. Moore*, 357 S.C. 458, 464, 593 S.E.2d 608, 612 (2004) (holding an issue must be raised to and ruled upon by the trial court to be preserved for review).

Even assuming the issue was preserved and the Court of Appeals erred in failing to rule on it, it is inconsequential whether the bottle constituted a deadly weapon as a matter of law. Moreover, the jury was specifically instructed that "a deadly weapon is any article, instrument or substance that is likely to cause death or great bodily harm." Furthermore, the State presented evidence that Dickey did not consider himself in imminent danger as Dickey readily exited the locked building and continued the confrontation outside of the apartment building.

As to the fourth element, the "duty to retreat," I find the State presented evidence that Dickey was not immune as a matter of law under the Castle Doctrine as Dickey was not

within the curtilage of the apartment building at the time of the shooting. At the time of the shooting, Dickey was on the doormat outside the front door of Cornell Arms. According to the testimony, the doormat was placed near the front of the building on a public sidewalk. As recognized by the Court of Appeals, it is a novel issue in this state as to whether a public sidewalk in front of an apartment building is considered curtilage. *Dickey*, 380 S.C. at 395, 669 S.E.2d at 924. In ruling that the public sidewalk did not constitute curtilage, the Court of Appeals relied on our state's jurisprudence establishing that curtilage does not extend to a public street. The Court of Appeals also cited cases from other jurisdictions where appellate courts "refused to hold there is no duty to retreat from a sidewalk in front of a business or residence." *Id.* at 396–97, 669 S.E.2d at 924.

For several reasons, I agree with the decision of the Court of Appeals. Initially, I would note that the court properly relied on this state's case law discussing curtilage with respect to public streets. The underlying theory in these cases is that a defendant is not immune from the duty to retreat on property where he did not have the right to eject his adversary. A public sidewalk falls within this category as it constitutes public land from which a person could not eject another person. Furthermore, the out-of-state cases cited by the Court of Appeals as well as other secondary authority support this proposition. See Jeffrey F. Ghent, Annotation, *Homicide: Duty to Retreat as Condition of Self–Defense When One is Attacked at His Office, or Place of Business or Employment,* 41 A.L.R.3d 584 (1972 & Supp.2011) (analyzing the doctrine of retreat within the general rules of self-defense and discussing state cases where courts have considered where a person attacked at his office or place of business is precluded from relying on his right to self-defense by a duty of retreat). Moreover, regardless of the position of the Cornell Arms doormat,[7] Dickey was on the public sidewalk at the time he

---

7. Dickey has asserted the Cornell Arms mat was flush with the front of the building and, therefore, not on the sidewalk. The position of the doormat or the overhang is not dispositive on the issue of curtilage. If this argument were taken to its logical extreme, curtilage would not be determined by the underlying property but rather the position of a business's accoutrements.

shot Boot. Once Dickey left the building and walked onto the public sidewalk, he was under a duty to retreat as the sidewalk was not part of the curtilage of his residence or business.

Furthermore, there is undisputed, quantifiable evidence that Dickey could have easily retreated without incident. The circumstances just prior to the shooting establish that Dickey was aware of the potential threat and had sufficient time to retreat. Dickey testified that he watched Boot and Stroud walk to the corner of Pendleton and Sumter Street before they turned around. At that point, according to crime scene investigators, Boot and Stroud would have been approximately 68 feet from the Cornell Arms doormat on which Dickey stood. Dickey testified that as Boot and Stroud came back in his direction they continued their profane rant and threatened to "whip [his] a—." Once Dickey realized that Boot and Stroud were heading back in his direction in a menacing manner, it would have been reasonable for Dickey to retreat. Thus, without question, Dickey had a duty to retreat; however, the question is whether Dickey could do so safely. This question was one for the jury to resolve.

Additionally, I find disingenuous the majority's reliance on Dickey's claimed disability as support for its holding regarding self-defense. Although Dickey testified he could not run as a result of this disability, there is evidence to the contrary in that he was able to descend several flights of stairs to the lobby in the same time it took Boot and Stroud to ride the elevator.

In view of the foregoing, I agree with the Court of Appeals that Dickey was not entitled to a directed verdict based on his claim of self-defense.

### B. Application of "Stand Your Ground" Law

In conjunction with his "duty to retreat" challenges, Dickey argues the Court of Appeals erred in finding the trial judge properly refused to retroactively apply the "Stand Your Ground" law to this case.

Although Dickey refers to the Act as the "Stand Your Ground" law, it is identified in the South Carolina Code as the "Protection of Persons and Property Act." S.C.Code Ann. § 16–11–410 (Supp.2010). This Act states, "It is the intent of

the General Assembly to codify the common law Castle Doctrine which recognizes that a person's home is his castle and to extend the doctrine to include an occupied vehicle and the person's place of business." Id. § 16–11–420(A). The Act became effective on June 9, 2006, and contained a "Savings Clause," which provides in pertinent part:

The repeal or amendment by this act of any law, whether temporary or permanent or civil or criminal, does not affect pending actions, rights, duties, or liabilities founded thereon, or alter, discharge, release or extinguish any penalty, forfeiture, or liability incurred under the repealed or amended law, unless the repealed or amended provision shall so expressly provide.

Act No. 379, 2006 S.C. Acts 2909.

Because this Act was promulgated prior to Dickey's September 2006 trial, defense counsel moved for the trial judge to dismiss Dickey's case based on the "immunity from criminal prosecution" created by the Act. The trial judge denied the motion, finding the Act did not apply as Dickey's case had been pending since April 2004 and, thus, was precluded from the Act's application.

The Court of Appeals held the trial judge properly refused to apply the Act retroactively. In so ruling, the court found the Act creates substantive rights for citizens and, therefore, the Act would only operate retroactively if there was a clear indication from the Legislature that this was intended. *Dickey*, 380 S.C. at 404–05, 669 S.E.2d at 928. Referencing the Act's savings clause, the court concluded that "the Legislature clearly manifested its intent that the Act be applied prospectively." *Id.* at 405, 669 S.E.2d at 928. Accordingly, the court held the Act should not have been applied to Dickey's case as the criminal prosecution was pending before the effective date of the Act. *Id.*

I find the Court of Appeals properly affirmed the trial judge's decision to preclude the application of the Act as the Legislature's intent is clear and unambiguous that the Act is to be applied prospectively. See *State v. Varner*, 310 S.C. 264, 266, 423 S.E.2d 133, 134 (1992) (recognizing that prospective application is presumed absent a specific provision or clear legislative intent to the contrary). In any event, the evidence

presented clearly showed that Dickey was not in his home, business, or vehicle at the time of the shooting.

## C. Sufficiency of Self–Defense Jury Instructions

Finding the trial judge properly submitted self-defense to the jury, I now assess the sufficiency of the judge's jury instructions.

### (1) *"Right to Act on Appearances"*

In challenging the judge's instructions, Dickey argues the Court of Appeals erred in finding the instruction on the right to act on appearances was adequate "where the instruction did not explain the proper test, which is especially critical where Dickey could see Boot reaching under his shirt." Additionally, Dickey asserts the Court of Appeals "failed to recognize that the right to act on appearances is a separate issue from the second and third elements of self-defense regarding actual danger and reasonable belief of danger."

As an initial matter, I believe Dickey is barred from raising certain arguments to this Court as they were not presented to the trial judge or the Court of Appeals. See *State v. Haselden*, 353 S.C. 190, 196, 577 S.E.2d 445, 448 (2003) (holding a defendant may not argue one ground at trial and another on appeal).

At trial, Dickey's counsel submitted two requests to charge on the right to act on appearances. Although the trial judge instructed the jury on the right to act on appearances, he did not use the specific language requested by Dickey.[8] On appeal, Dickey generally argued that the trial judge "erred by refusing to adequately charge on appearances." Accordingly,

---

8. The trial judge instructed the jury on the right to act on appearances as follows:

> In deciding whether the defendant was or believed that he was in imminent danger of death or serious bodily injury you should consider all of the facts and circumstances surrounding the offense including the physical condition and the characteristics of the defendant and the victim. . . . [I]t does not have to appear that the defendant was actually in danger. It is enough if the defendant believed that he was in imminent danger and a reasonably prudent person of ordinary firmness and courage would [have] had the same belief. A defendant has the right to act on appearances even though the defendant's beliefs may have been mistaken.

I confine my review of this issue solely to a determination of whether the trial judge's instruction on the right to act on appearances adequately covered Dickey's requests to charge.

To warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. *Burkhart*, 350 S.C. at 263, 565 S.E.2d at 304. "Failure to give requested jury instructions is not prejudicial error where the instructions given afford the proper test for determining the issues." *Id.* An appellate court will not reverse the trial judge's decision regarding a jury charge absent an abuse of discretion. *State v. Pittman*, 373 S.C. 527, 570, 647 S.E.2d 144, 166 (2007).

Turning to the facts of the instant case, I agree with the decision of the Court of Appeals that the trial judge sufficiently instructed the jury on the right to act on appearances as the instruction essentially "tracked" the language of this Court's opinion in *State v. Jackson*, 227 S.C. 271, 278, 87 S.E.2d 681, 684 (1955).[9] Notably, Dickey cited *Jackson* in support of his two requests. Given the judge's instruction covered the substance of Dickey's requests, the judge's failure to charge the requests did not constitute reversible error.

### (2) *"Curtilage/Duty to Retreat"*

Dickey asserts the Court of Appeals erred in finding the trial judge correctly refused to instruct the jury on curtilage. In support of this assertion, Dickey claims the Court of Appeals erred in holding that "the duty to retreat was adequately charged based solely on its conclusion that the public sidewalk was not curtilage."

At trial, Dickey's counsel requested the following instruction on curtilage:

The absence of a duty to retreat extends to the curtilage of the dwelling or place of business. The curtilage is the

---

**9.** In *Jackson*, this Court held:

The test is not whether there was testimony of an *intended* attack but whether or not the appellant *believed* he was in imminent danger of death or serious bodily harm, and he is not required to show that such danger actually existed because he had a right to act upon such appearances as would cause a reasonable and prudent man of ordinary firmness and courage to entertain the same belief.

*Jackson*, 227 S.C. at 278, 87 S.E.2d at 684.

area of land adjoining a dwelling or business, which includes porches, outbuildings, yards, gardens and parking lots.

Although the trial judge declined this instruction, he charged the jury on the duty to retreat:

I would charge you that if a defendant is on his own premises or if a defendant is on his own place of business that the defendant had no duty to retreat before acting in self-defense.

As previously discussed, I agree with the Court of Appeals' ruling that Dickey was not within the curtilage of the apartment building as he was on a public sidewalk at the time of the shooting. Even if curtilage should have been charged, I find Dickey's request to charge was an incorrect statement of law. The charge expanded this state's definition of curtilage by adding the phrase "the area of land adjoining a dwelling or business." See *Wiggins,* 330 S.C. at 548 n. 15, 500 S.E.2d at 494 n. 15 (defining curtilage to include outbuildings, the yard around a dwelling, a garden of the dwelling, or the parking lot of a business); cf. *State v. Brooks,* 79 S.C. 144, 149, 60 S.E. 518, 520 (1908) (stating that "one on his land, adjoining a public road, if assaulted by another who is on such road, is bound to retreat before taking the life of his adversary if there is probability of his being able to escape without losing his life or suffering grievous bodily harm" given "he would not have had the right to eject his adversary from the place where he had a right to be").

Accordingly, I believe the Court of Appeals correctly found that self-defense was properly submitted to the jury and the trial judge sufficiently charged the requisite elements.

## II. Voluntary Manslaughter

In view of my conclusion that Dickey was not entitled to a directed verdict of acquittal based on self-defense and the instructions regarding self-defense do not warrant reversal, the question becomes whether the trial judge erred in submitting the lesser-included offense of voluntary manslaughter to the jury or committed error in the substance of the jury instructions.

## A. Submission of Voluntary Manslaughter to the Jury

Dickey asserts the Court of Appeals erred in "failing to reconcile that fear can constitute heat of passion under *Wiggins* with self-defense as a matter of law under *Hendrix*." In support of this assertion, Dickey claims the fear required for voluntary manslaughter "must be considerably greater in degree or kind than the rational fear" required for self-defense. Specifically, Dickey believes that "it must be an irrational fear that causes a person to lose control of himself temporarily." He further contends the Court of Appeals erred in finding there was "ample evidence" of heat of passion to support a charge of voluntary manslaughter. Essentially, Dickey avers the evidence supports a finding that "he either shot with malice or in self-defense"; therefore, the jury should not have been instructed on voluntary manslaughter.

"Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *Pittman,* 373 S.C. at 572, 647 S.E.2d at 167 (citation omitted). "Heat of passion alone will not suffice to reduce murder to voluntary manslaughter." *Id.* "Both heat of passion and sufficient legal provocation must be present at the time of the killing." *Id.* "The sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence." *Id.*

"To warrant the court in eliminating the offense of manslaughter it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *Id.* at 572, 647 S.E.2d at 168 (citation omitted). "In determining whether the act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." *State v. Norris,* 253 S.C. 31, 35, 168 S.E.2d 564, 566 (1969).

After the Court of Appeals issued its decision as to Dickey's case, this Court clarified the law with respect to whether fear can constitute sudden heat of passion. *State v. Starnes*, 388 S.C. 590, 698 S.E.2d 604 (2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 1504, 179 L.Ed.2d 330 (2011).

In *Starnes*, the defendant appealed his two murder convictions arguing, in part, that the trial judge erred in failing to charge the jury on the law of voluntary manslaughter. *Id.* at 596, 698 S.E.2d at 607–08. Starnes claimed he was entitled to the charge as he testified that when one of the victims pointed a gun at him, he felt threatened and was in fear; thus, the threat of imminent deadly assault was sufficient to submit the charge of voluntary manslaughter to the jury. *Id.* at 596, 698 S.E.2d at 608.

Although the Court found the trial judge properly refused to charge voluntary manslaughter, it clarified the law concerning "how a defendant's fear following an attack or a threatening act relates to voluntary manslaughter." *Id.* at 597, 698 S.E.2d at 608. Specifically, the Court stated:

> We reaffirm the principle that a person's fear immediately following an attack or threatening act may cause the person to act in a sudden heat of passion. However, *the mere fact that a person is afraid is not sufficient, by itself, to entitle a defendant to a voluntary manslaughter charge.* Consistent with our law on voluntary manslaughter, in order to constitute "sudden heat of passion upon sufficient legal provocation," the fear must be the result of sufficient legal provocation **and** cause the defendant to lose control and create an uncontrollable impulse to do violence. Succinctly stated, *to warrant a voluntary manslaughter charge, the defendant's fear must manifest itself in an uncontrollable impulse to do violence.*

> A person may act in a deliberate, controlled manner, notwithstanding the fact that he is afraid or in fear. Conversely, a person can be acting under an uncontrollable impulse to do violence and be incapable of cool reflection as a result of fear. The latter situation constitutes sudden heat of passion, but the former does not. Evidence that

fear caused a person to kill another person in a sudden heat of passion will mitigate a homicide from murder to manslaughter-it will not justify it. This is the distinction between voluntary manslaughter and self-defense. We re-iterate that evidence of self-defense and voluntary man-slaughter may coexist and that a charge on self-defense **and** voluntary manslaughter may be warranted.

*Id.* at 598–99, 698 S.E.2d at 609 (second emphasis added).

Applying *Starnes* to the facts of the instant case, I find the Court of Appeals correctly affirmed the trial judge's decision to submit voluntary manslaughter to the jury as a lesser-included offense of murder. Initially, I note that Dickey conceded the element of sufficient legal provocation; thus, I confine my analysis to the remaining element of heat of passion.

I find the State presented evidence from which the jury could have determined that Dickey's fear manifested itself in an uncontrollable impulse to do violence. Dickey testified that he was "afraid of being hurt or killed." In addition to evidence of Dickey's fear, West and McGarrigle claimed that Dickey looked "angry" and appeared "irritated" during the encounter outside of the apartment. Furthermore, over the course of a short time-period, Dickey endured Boot's profane verbal attack and threats of violence, thus, rendering Dickey incapable of cool reflection as a result of his anger and fear of Boot. In light of this evidence, I disagree with the majority's conclusion that Dickey "acted in a deliberate, controlled manner." It cannot be said that there was no evidence whatsoever tending to reduce the crime from murder to manslaughter.

## B. Trial Judge's Use of an "Illustration" in Charge

In concluding that the trial judge properly submitted the charge of voluntary manslaughter to the jury, the analysis turns to the substance of the judge's instruction.

Dickey argues the Court of Appeals erred in finding the trial judge's illustration during the voluntary manslaughter portion of his charge was not an improper comment on the

facts of the case. Specifically, Dickey challenged the following language in the judge's charge:

> By way of illustration and I would point out this is by illustration alone, that if an unjustifiable assault is made with violence with the circumstances of indignity upon a man's person and the party so assaulted kills the aggressor the crime will be reduced to manslaughter.

Dickey claims the illustration was an unconstitutional [10] comment on the facts of the case given "the undisputed nature of the facts and the judge's directive that the exact facts of the case 'will be' manslaughter."

The Court of Appeals rejected Dickey's challenge. In so ruling, the court found the charge, taken as a whole, was not erroneous as it was "unlikely that a reasonable juror would have singled out the illustration portion of the charge and interpreted it as the court's opinion on the facts of this case or as an instruction on the weight to be given to the evidence." *Dickey*, 380 S.C. at 402–03, 669 S.E.2d at 927.

For several reasons, I agree with the Court of Appeals' finding that the judge's "illustration" did not constitute reversible error. First, the judge was extremely thorough in his instructions and emphasized to the jurors that they were the arbiters of the facts. Secondly, the judge clearly instructed the jury that his instruction was "by illustration alone." Finally, the judge did not impermissibly indicate his opinion as to the weight or sufficiency of the evidence, Dickey's guilt, or any fact in controversy. Significantly, the judge instructed the jury that he was not permitted to have any opinions regarding the facts of the case and that the jury should not construe anything he said during trial as an opinion regarding the facts. See *State v. Jackson* 297 S.C. 523, 526, 377 S.E.2d 570, 572 (1989) ("Under South Carolina law, it is a general rule that a trial judge should refrain from all comment which tends to indicate to the jury his opinion on the credibility of the witnesses, the weight of the evidence, or the guilt of the accused.").

---

10. See S.C. Const. art. V, § 21 ("Judges shall not charge juries in respect to matters of fact, but shall declare the law.").

518

Based on the foregoing, I would affirm the decision of the Court of Appeals.