# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jerome Campbell, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2018-000464

———————————

Appeal from Charleston County
William H. Seals, Jr., Circuit Court Judge

———————————

Opinion No. 5999
Heard February 16, 2023 – Filed July 19, 2023
Withdrawn, Substituted, and Refiled October 18, 2023

———————————

**AFFIRMED**

———————————

Clarence Rauch Wise, of Greenwood, for Petitioner.

Assistant Attorney General Zachary William Jones, of
Columbia, for Respondent.

———————————

**GEATHERS, J.:** In this post-conviction relief (PCR) action, Petitioner Jerome
Campbell (Campbell) seeks review of an order dismissing his claim of ineffective
assistance of counsel. Campbell argues that the PCR court erred in finding that
Campbell's trial counsel was not ineffective in failing to object to the trial court's
mutual combat charge. We affirm.

**FACTS**

This case involves a convoluted web of familial and domestic quarrels which ended in a deadly shootout between two groups at a gas station leaving Michael German (the victim) dead.

The first of these quarrels was a dispute between Jerome Campbell's nephew-in-law, Anthony German, and both Campbell's sister and Campbell's mother. Campbell's sister and mother called Anthony to ask if he and his wife would visit with his newborn child. He refused. Campbell was made aware of Anthony's refusal and promptly called Anthony and threatened to kill him for not visiting his mother and sister with the child.

The second quarrel arose from a marital dispute between Campbell's sister and her husband, Michael Allen (Allen), later that day. Campbell's mother and Allen's brother, Frank Haigler (Frank), were invited over to the apartment to mediate tensions, but their efforts proved unsuccessful. Anthony and his brother, the victim (the German brothers), then arrived and forced their way into Allen's apartment. According to witness testimony, while inside the apartment, both Anthony and Michael said to Campbell's mother that they were going to kill her son. After Campbell's mother threatened to call the police, Allen, Frank, and the German brothers (Anthony's Group) left Allen's apartment together and drove to Anthony's apartment. After they left, Campbell's sister and mother notified Campbell about the events, including the death threats. In response, Campbell called Anthony's Group to let them know that Campbell would be stopping by Anthony's apartment shortly.

Later that afternoon, Campbell arrived at Anthony's apartment in his white Chevrolet Impala accompanied by two individuals. As Campbell entered the parking lot of Anthony's apartment complex, he approached Anthony's Group, who were standing outside. Campbell shouted at the men, and a member of Anthony's Group, Frank, cautiously approached Campbell's vehicle. Campbell rolled down the rear side window and aimed a pistol at Frank. Frank shouted, "[y]o, everybody back up because he's got a gun." Anthony's mother—who was at Anthony's apartment at the time—heard Frank and yelled "[g]et in the house, get in the house[]" which prompted Campbell to speed off. Anthony's Group received a number of threatening phone calls from Campbell shortly after he left the complex. During one of the calls, Campbell told Allen of Anthony's Group while on speaker phone, "[y]ou better not come home. I'll be there soon."

In response to Campbell's threats, Anthony retrieved his pistol "for protection [from Campbell]." Anthony's Group then made their way to Allen's apartment

complex to confront Campbell. Instead of driving into the complex, they decided to park at a gas station across the street. Allen and the German brothers stayed back at the gas station while Frank crossed the street unarmed to speak to Campbell in an attempt to defuse the situation. In the parking lot of the apartment complex, Frank and Campbell had a brief exchange that culminated in Campbell punching Frank in the face. Campbell then gestured toward two unknown individuals who began to approach with shotguns.[1] Frank darted down an alleyway adjacent to the apartment complex and crawled towards the road in the direction of the gas station. Campbell and the two unknown gunmen entered his white Chevrolet Impala and drove toward the gas station across the street. Still at the gas station, Anthony's Group spotted the vehicle, dove to the ground, and a fusillade of gunshots were fired in both directions.[2] The victim was struck by gunfire and pronounced dead at the scene. The cause of death was determined to be a gunshot wound to the left side of his head. That night, Campbell surrendered himself to the police department.

On January 23–27, 2012, Campbell was tried before a jury and convicted of the victim's murder as well as three counts of assault with intent to kill (AWIK). Campbell was sentenced to thirty years' imprisonment for murder and ten years for each count of AWIK, to run concurrently. Campbell appealed, and this court affirmed his convictions in an unpublished opinion.[3] On May 12, 2014, Campbell filed a PCR application. On January 9, 2018, his application was denied and dismissed with prejudice. The PCR court found that "the trial court's instruction on mutual combat was supported by the evidence presented at trial and any objection would not have been successful." This appeal followed.

## STANDARD OF REVIEW

"In a PCR case, [our appellate courts] will uphold the PCR court's factual findings if there is any evidence of probative value in the record to support them." *Thompson v. State*, 423 S.C. 235, 239, 814 S.E.2d 487, 489 (2018). "However, this

---

[1] It is unclear from the record whether these were the same individuals who accompanied Campbell to Anthony's apartment earlier that day.

[2] There is conflicting evidence as to whether Anthony's pistol was ever fired. However, a high level of gunshot residue was found on the victim's hand. At trial, Chris Robinson, a forensic consultant employed as an expert witness, stated, "I can a hundred percent say [firing a weapon is] the only way in all my training that I know that you can get [gunshot residue] levels that were [] that high[.]"

[3] *State v. Campbell*, Op. No. 2013-UP-338 (S.C. Ct. App. filed Aug. 7, 2013).

[c]ourt gives no deference to the PCR court's conclusions of law, and we review those conclusions de novo." *Id*.

## LAW/ANALYSIS

### I.     Background on Mutual Combat

"The doctrine of mutual combat has existed in South Carolina since at least 1843," but had fallen out of common use until its recent resurgence. *State v. Taylor*, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003). To constitute mutual combat, there must be "mutual intent and willingness to fight." *State v. Graham*, 260 S.C. 449, 450, 196 S.E.2d 495, 495 (1973). The intent to fight is "manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat." *Id*. Additionally, "[t]he State is required to prove the rival combatants were armed for the mutual combat with deadly weapons and each combatant knew the others were armed." *State v. Young*, 429 S.C. 155, 160, 838 S.E.2d 516, 519 (2020). In 2003, our supreme court in *Taylor* revised the long-established doctrine by cementing within our jurisprudence both the knowledge requirement between combatants and the requirement that "the fight arise out of a pre-existing dispute[.]" 356 S.C. at 233–234, 589 S.E.2d at 4–5.

To illustrate a scenario in which a newly-revised mutual combat charge would be warranted, the court in *Taylor* cited its reasoning in *Graham*:

> [t]here was ill-will between the parties. They had threatened each other[,] and **it is inferable that they had armed themselves to settle their differences at gun point**. Under these circumstances, the apparent willingness of each to engage in an armed encounter with the other[] sustained an inference that they were engaged in mutual combat at the time of the killing[] and required that the issue be submitted to the jury for determination.

*Id*. at 234, 589 S.E.2d at 4 (quoting *Graham*, 260 S.C. at 452, 196 S.E.2d at 496) (bolding added). The court in *Taylor* distinguished its facts from *Graham* in finding that "[t]here is no evidence . . . that there was any pre-existing ill-will or dispute between [the combatants], and there is no evidence that [the victim] was willing to engage in an *armed* encounter with Petitioner." *Id*. at 234, 589 S.E.2d at 5.

### II.     Ineffective Assistance of Counsel

"A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013). "To establish ineffective assistance of counsel, the PCR applicant must prove (1) counsel's performance fell below an objective standard of reasonableness, and (2) the applicant sustained prejudice as a result of counsel's deficient performance." *Thompson*, 423 S.C. at 239, 814 S.E.2d at 489. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland v. Washington*, 466 U.S. 668, 700 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the [appellant] makes an insufficient showing on one." *Id*. at 697.

## A. Factual Basis for Mutual Combat Charge

Campbell argues that his trial counsel was deficient in failing to object to the mutual combat charge because there was a lack of factual support for the charge. We disagree.

With regard to a showing of deficient performance, a PCR applicant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88.

In the present case, the evidence supports a jury instruction on mutual combat. We believe the following set of facts gleaned from *Graham* resemble those before us on appeal:

> Appellant and deceased had quarreled prior to the day of the killing. Both had made threats against the other[,] and appellant purchased a pistol on the night before the fatal encounter. They met in town shortly before the shooting and engaged in a heated discussion, during which appellant waved a pistol in the face of the deceased. The deceased, who apparently had no weapon at the time, then drove out of town in his truck, returning a short time later with his pistol. When the deceased returned, he parked his truck in front of a barber shop and got out with his pistol in his hand. As the deceased left his truck, appellant, who was in the barber shop and had observed the deceased's return, walked into the street, placing himself in a position

where an encounter with the deceased could be expected. Appellant could see the weapon in the possession of the deceased, and the deceased knew that appellant was armed. As appellant entered the street from the barber shop, both parties fired at each other. The deceased was mortally wounded and died a short time thereafter.

260 S.C. at 451, 196 S.E.2d at 496.

Other cases where courts of this state have approved mutual combat instructions were decided on similar fact patterns. *See, e.g.*, *State v. Young*, 429 S.C. 155, 165, 838 S.E.2d 516, 521 (2020) (finding the gunmen were "clearly engaged in mutual combat" when, "although they were adversaries, [the mutual combatants] jointly incited one another to continue the cat-and-mouse gun battle that resulted in the victim's death"); *id.* at 167, 838 S.E.2d at 522 (Hearn, J., dissenting) (observing that mutual combat cases relied upon by the majority "involve[] individuals or groups on opposite sides who engaged in a gun battle where both sides *contemporaneously* opened fire on one another"); *State v. Mathis*, 174 S.C. 344, 348–49, 177 S.E. 318, 319 (1934) (finding no error in charging mutual combat when "[t]here was testimony that the appellant and the deceased were on the lookout for each other; that they were armed in anticipation of a combat; that each drew his pistol and each fired upon the other"); *State v. Porter*, 269 S.C. 618, 622–23, 239 S.E.2d 641, 643 (1977) (finding mutual combat when "[the] appellant returned with a gun to [the decedent's] property at least twice in spite of prior verbal abuse, threats[,] and gunshots"); *State v. Washington*, 424 S.C. 374, 412–13, 818 S.E.2d 459, 479–80 (Ct. App. 2018) (approving the trial court's refusal to charge self-defense because of mutual combat where the defendant followed the victim around in a club and "stared him down throughout the night," followed the victim out the door as everyone was leaving, and initiated a fight with the victim, resulting in a mutual brawl), *vacated in part and rev'd in part on other grounds*, 431 S.C. 394, 848 S.E.2d 779 (2020).

The case law of other states also contains opinions endorsing mutual combat charges on similar fact patterns where the parties' back-and-forth quarrels or threats culminated in a fatal encounter. *See, e.g.*, *Carreker v. State*, 541 S.E.2d 364, 365–66 (Ga. 2001) (approving mutual combat charge where the defendant, in response to learning that the victim had threatened the defendant's brother with a rifle, armed himself, made threats to harm the victim to several witnesses, gathered a group, traveled to the victim's property, and fatally shot him); *Millen v. State*, 600 S.E.2d 604, 608–09 (Ga. Ct. App. 2004) (finding the evidence supported a mutual combat

charge when the victim and the defendant had been quarrelling throughout the evening, the victim's son arrived with a rifle, the defendant took shelter in an upstairs room, and the victim and her son went upstairs to confront the defendant); *State v. Abraham*, 854 A.2d 89, 95–96 (Conn. App. Ct. 2004) (finding a mutual combat charge was justified when the defendant knew of the ongoing quarrels between the victim and the defendant's friend, armed himself in response the victim's threat to "savage" his friend, and fatally shot the victim during an ensuing altercation); *State v. Morales*, 160 A.3d 383, 394–95 (Conn. App. Ct. 2017) (finding a combat by agreement charge was supported because the defendant was present throughout repeated quarrels between the decedent and another combatant, the defendant accompanied the combatant to an agreed upon fist-fight with the victim, and the defendant was first to run to a gun as conflict escalated).

Here, the following events run parallel to those in the above cases. Campbell quarreled with and threatened to kill Anthony prior to the fatal encounter. Likewise, Anthony and his group made threats to Campbell's life to Campbell's mother and sister, who subsequently relayed the threats to Campbell. Campbell met with Anthony's Group, who were unarmed at the time, before the shooting and flashed a pistol at them. After a brief interval, Anthony collected his firearm to protect himself from Campbell, and Anthony's Group went to a gas station in close proximity to the apartment where Campbell claimed he would be waiting. After Frank's unsuccessful attempt to broker détente, two men accompanying Campbell were observed brandishing shotguns. By this point, a member of each group had threatened to kill a member of the other, and both had driven around town attempting to hunt the other down. Campbell and the unknown gunmen entered Campbell's Impala and drove to the gas station across the street, where Anthony's Group (save for Frank) were standing. Forensic evidence later supported a finding that both sides fired at each other, resulting in the victim's death.

"Under [the circumstances in *Graham*], the apparent willingness of each to engage in an armed encounter with the other[] sustained an inference that they were engaged in mutual combat at the time of the killing[] and required that the issue be submitted to the jury for determination." *Graham*, 260 S.C. at 452, 196 S.E.2d at 496. Similarly, in the present case, it is inferable from the mutual death threats and encounters in which firearms were brandished that each combatant was willing to engage in an armed encounter and that each knew the other was armed. *See id.* ("[I]t is inferable that [the combatants] had armed themselves to settle their differences at gun point"). In *Graham*, at least one of the parties did not know the other was armed until virtually the moment that gunshots were exchanged. The facts in the present case created an inference of mutual combat that necessitated a corresponding charge

to be submitted to the jury.  Therefore, Campbell's trial counsel's decision not to object to the jury charge did not fall below an objective standard of reasonableness.

### B. Permissibility of Burden Shifting

Campbell additionally argues that his trial counsel's failure to object to the mutual combat charge constituted ineffective assistance of counsel because the charge impermissibly shifted the burden of proof on self-defense to Campbell. Campbell's brief frames this as an issue of prejudice; however, the relevance of any prejudice to Campbell is predicated on whether his trial counsel was deficient in failing to object to the mutual combat charge.  Thus, we must first determine whether Campbell's trial counsel was deficient in failing to object to the jury charge under this alternative rationale before considering whether to undertake a prejudice analysis.  *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the [appellant] makes an insufficient showing on one.").

"Mutual combat relates primarily to the law of self-defense." *State v. Bowers (Bowers II)*, 436 S.C. 640, 647, 875 S.E.2d 608, 612 (2022).[4]  Self-defense comprises four elements—the first of which relates to the doctrine of mutual combat. *See id.* ("[Our supreme c]ourt has explained self-defense by referring to four elements."); *see also State v. Dickey*, 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011) (listing each of the four elements of self-defense).  Termed the "'no fault' element of self-defense[,]" the first element requires a defendant to be "without fault in bringing on the difficulty." *Taylor,* 356 S.C. at 232, 235, 589 S.E.2d at 3, 5 (quoting *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984)).  "[I]f a defendant is found to have been involved in mutual combat, the 'no fault' element of self-defense cannot be established." *Id.* at 232, 589 S.E.2d at 3.  In other words, "mutual combat acts as a bar to self-defense . . ." *Id.* at 234, 589 S.E.2d at 4.  A defendant may by word or act withdraw from mutual combat and restore their right to self-defense, but this action must be known to the opposing combatant. *See Young*, 429 S.C. at 161, 838 S.E.2d at 519 ("A combatant may withdraw from mutual combat if he 'endeavors in

---

[4] Our supreme court granted certiorari on *State v. Bowers* (*Bowers I*), 428 S.C. 21, 832 S.E.2d 623 (Ct. App. 2019), *aff'd*, 436 S.C. 640, 875 S.E.2d 608 (2022), but on an issue different from the mutual combat issue before this court. *See Bowers II.* at 645–46, 875 S.E.2d at 611 ("The State does not challenge the court of appeals' analysis of the evidence or its ruling that the doctrine of mutual combat is not applicable.  Rather, the State challenges whether the court of appeals' ruling on that issue requires reversal of the ABHAN conviction.").

good faith to decline further conflict[] and, either by word or act, makes that fact known to his adversary.'" (quoting *Graham*, 260 S.C. at 451, 196 S.E.2d at 496)).

Campbell takes issue with the circuit court's instruction that "[i]f the defendant voluntarily participated in mutual combat for purposes other than protection, the killing of the victim would not be self-defense." Specifically, Campbell believes the instruction conflicts with his understanding of *Taylor*'s holding "that it is improper for a trial court to charge both self-defense and mutual combat." However, this oversimplified interpretation of *Taylor* distorts its meaning. In *Taylor*, our supreme court found that the burden of proof impermissibly shifted to the defendant to prove self-defense when a self-defense "charge was negated by the court's *unwarranted* charge on mutual combat." 356 S.C. at 235, 589 S.E.2d at 5 (emphasis added).[5] However, when evidence warrants a mutual combat charge, it may be charged to a jury even when read alongside a self-defense charge. *See State v. Jackson*, 384 S.C. 29, 38 n.5, 681 S.E.2d 17, 21 n.5 (Ct. App. 2009) ("We do not suggest mutual combat and self-defense are mutually exclusive; rather, in *Taylor*, there was no evidence that the victim was willing to engage in mutual combat with [the defendant].").

In the present case, the State presented evidence to support a jury charge on mutual combat. Because the charge was warranted, Campbell's trial counsel was not deficient in failing to object to its reading alongside the circuit court's jury charge on self-defense. *See Jackson*, 384 S.C. at n.5, 681 S.E.2d at n.5 (clarifying that when "there [is] no evidence [a] victim [is] willing to engage in mutual combat[,]" charging mutual combat and self-defense creates unfair prejudice; however, "mutual combat and self-defense are [not] mutually exclusive" when mutual combat is supported by the evidence).

## CONCLUSION

Accordingly, the PCR court's dismissal of Campbell's ineffective assistance of counsel claim is

---

[5] In a similar misunderstanding, Campbell asserts that this court in *Bowers I* "found that the mere charge as to mutual combat was prejudicial because it negated self-defense." The *Bowers* court found "the *erroneous* charge on mutual combat was prejudicial because the charge effectively negated Appellant's self-defense plea." *Bowers I*, 428 S.C. at 37, 832 S.E.2d at 632 (emphasis added). Like the description of the charge in *Taylor* as "unwarranted," the operative word in *Bowers* was "erroneous."

**AFFIRMED.**

**WILLIAMS, C.J., and VERDIN, J., concur.**