**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Gregory Sanders, Appellant.

Appellate Case No. 2018-000911

-----

Appeal From Hampton County
Carmen T. Mullen, Circuit Court Judge

-----

Unpublished Opinion No. 2022-UP-298
Heard November 10, 2021 – Filed July 13, 2022

-----

**AFFIRMED**

-----

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Assistant Attorney General Michael Douglas Ross, and Assistant Attorney General Julianna E. Battenfield, all of Columbia; and Solicitor Isaac McDuffie Stone, III, of Bluffton, all for Respondent.

-----

**PER CURIAM:** Gregory Sanders appeals his convictions for murder and possession of a weapon during the commission of a violent crime. Sanders argues the trial court erred by admitting a text message into evidence because the text message was (1) not properly authenticated and (2) inadmissible hearsay. We affirm.

**FACTS/PROCEDURAL HISTORY**

In the early morning hours of May 10, 2016, Sanders shot and killed Tyhira Harrington. A Hampton County grand jury indicted Sanders for murder and possession of weapon during the commission of a violent crime. At a jury trial in May of 2018, Sanders testified in his own defense and admitted to the shooting but claimed he was acting in self-defense.

At trial, Marilyn Garvin, Harrington's mother, testified she knew Sanders because he had spent time at an apartment she shared with Harrington, and Harrington did his hair. Garvin explained that a few days prior to the murder, she came across Sanders while she and her boyfriend, Samson Williams, were walking to the store. Garvin testified Sanders stated, "[Y]ou better get you a black dress, because I'm going to kill your daughter, because she took me to Allendale to try to get me set up."[1]

Garvin testified that on the night of the shooting, she was in the process of moving out of the apartment she shared with Harrington. She stated Sanders came to Harrington's apartment earlier in the evening while she, Harrington, Kywana Bradley, Yhantyse "Daisy" Priester, and a man named Alexander were there. Garvin heard Harrington deny setting Sanders up to be robbed. Garvin recalled that Sanders "threw a bandana down on the floor" and said "it's on the five" but she did not know what that meant. She stated no one struck Sanders while he was in the apartment and he walked out unharmed after the encounter.

Garvin then testified she received a text message from Johnny McKnight, who was saved as a contact in her cellphone under the nickname, "Johnny Blaze." Garvin identified State's Exhibit 25 as a screenshot of the text message and agreed the message had not been changed or altered, and it was a "fair and accurate . . . copy of the text message." She stated she recognized State's Exhibit 25 "[b]ecause they [sic] programmed in my phone as Johnny Blaze, and the same text [wa]s in my

---

[1] Williams also testified at trial and gave the same account regarding Sanders's statement to Garvin.

phone."  Garvin further indicated she still owned the same phone and could access the text message.  When the State moved to enter the text message into evidence, Sanders objected, arguing the text message was inadmissible hearsay and questioning who created the text message.  The trial court admitted the text message into evidence subject to Sanders's objection.

Garvin then read the text message aloud for the jury: "I just seen [Sanders's girlfriend] walkn behind da apts.  He's probably hidn 2.  Tryn sum.  GOD S GIFT."  She interpreted the text message to mean that Sanders and his girlfriend were "trying to lure [Harrington] out [of her] house."  Without objection, Garvin explained she then called Harrington to tell her that McKnight had sent her a text message indicating that "[Sanders] and his girlfriend w[ere] going back behind [Harrington's] apartment."  A few hours later, Garvin learned Harrington had been shot.

Bradley testified that earlier in the evening of the shooting, she, Priester, and Harrington had gone to a club and when they returned to Harrington's home, Sanders was there "to clear his name."  Bradley recalled Harrington confronted Sanders about what he said to Garvin and the conversation led to an argument.  Bradley stated there was no fighting, no one hit Sanders, and Sanders left when he was asked to leave.  Bradley testified that after Sanders left, Harrington and Priester also departed to take Garvin home.  Bradley stated she stayed behind, and while sitting in the apartment, she heard someone "playing with" the front doorknob.  Bradley explained she did not know who it was at the time but called Harrington to warn her that someone was trying to get into her apartment and to be careful.

Priester, Randy White, and Marquis Alston, all of whom were with Harrington when she drove back to the apartments, also testified at trial.  White, who was dating Harrington, testified Harrington picked him up on the night of the shooting and Priester and Alston were already in the car.  White recalled Harrington received a phone call, hung up, and sped off towards the apartments.  He stated they then saw Sanders and his girlfriend standing by a laundromat, and Harrington stopped and parked the car right in front of them.  White testified the four of them got out of the car and Harrington started walking toward Sanders, who began backing up.  According to White, after they got out of the car, Priester stayed close to the car but White followed Harrington as she advanced toward Sanders because he was trying to keep her from getting too close to Sanders.  White testified Harrington was "full of rage" but the only people who were arguing were Harrington and Sanders.  He stated no one tried to strike Sanders, no one was

standing in Sanders's way, and he could have walked away. White testified Sanders told him: "[G]o away; you don't want to be no witness." He stated Sanders "pulled out a gun and shot [Harrington] and then walked away with his girlfriend." White recalled he never saw Harrington with a weapon that night and never knew her to carry a weapon.

Alston testified he knew Harrington and Priester through White. Alston, although initially stating he did not remember much from the night of the shooting, testified that when Harrington stopped the car, he got out and went next door to see Bradley. He stated there was no fighting going on. He recalled he heard the gunshot but denied telling law enforcement he saw Sanders with a gun. Later during trial, Investigator Donald Hipp of the Hampton County Sheriff's Office testified he interviewed Alston, and during the interview, Alston stated he heard and saw Sanders shoot Harrington and walk away calmly.

Priester testified similarly to Bradley and Garvin as to Sanders's visit to Harrington's apartment earlier on the night of the shooting and recalled he had come to "clear his name." Consistent with White's testimony, Priester stated that while in the car with Harrington, Harrington received a call that someone was "at the back door trying to get in, shaking the back door" of Harrington's apartment. Priester testified Harrington drove back to the apartments and when she saw Sanders and his girlfriend near the laundromat, Harrington swung into the laundromat and they all got out of the car. Priester stated she tried to calm Harrington down because Harrington was angry and had been drinking all day. She recalled Sanders, his girlfriend, and Harrington were all standing in the street. Priester testified, "I guess he moved in the road to—to get what angle he would really want to shoot her at." Priester explained that when he moved, Sanders asked Harrington: "[A]ll these people out here, and how many people you think are gonna ride for you?" and then he shot her. Priester testified Sanders did not appear to be in fear of his safety at the time. She recalled that after he shot Harrington, he pointed the gun at her for a few moments and then ran away. Priester indicated Harrington was the only one confronting Sanders and his girlfriend. She testified Harrington had no weapon and made no reference to a gun.

Chief Mark Collins testified he arrested Sanders on May 10, 2016, and that during the arrest, he found a gun wrapped in a bundle of clothing near Sanders. Captain Alexander Williams testified he assisted with Sanders's arrest and gave Sanders *Miranda* warnings. Captain Williams recalled Sanders made a statement referring to his eye, which was bloodshot and "a little swollen," explaining his girlfriend caught him cheating.

Paul Greer, a firearms examiner with the South Carolina Law Enforcement Division (SLED) testified the projectile recovered from the wound to Harrington's head was fired by the gun found during Sanders's arrest. Ila Simmons, also with SLED, opined the gun had to have been within about two inches of Harrington's skin when it was fired. Similarly, Dr. Ellen Riemer, who performed Harrington's autopsy, opined the gunshot came from a distance of three or four inches up to a couple of feet from Harrington's head.

Sanders denied saying anything to Garvin about "buying a black dress" or threatening to kill Harrington. He testified he went to Harrington's earlier on the day of the shooting to "clear [his] name." Sanders stated Harrington punched him in the eye and Bradley, Harrington, and Priester "lynched" him inside the apartment. He claimed he fought his way to the door and left. Sanders testified he met up with his girlfriend afterwards and around midnight or 1:00 a.m., they left to walk home. Sanders explained that while they were walking home, a car drove past them, slammed on the brakes, backed up, and pulled up close to where they were. He stated all four of the occupants got out. Sanders testified Harrington said, "we about to f*** you all up." He recalled he stood in front of his girlfriend and started backing up. Sanders testified Harrington said she wanted to fight his girlfriend but because his girlfriend did not want to fight, Harrington said she wanted to fight Sanders. He stated Harrington then said, "I ain't worried about nothing, I got my iron in the seat" and he believed Harrington was referring to a gun. Sanders stated he did not really have an avenue of retreat because the car was in front of them and the laundromat was behind them. Sanders recalled he then told everyone to leave them alone and go home. He testified that in response, Harrington kept "running off at the mouth"; White was right beside her and every time she moved up, he moved up; Priester was on the other side of Harrington but did not move; and Alston was still standing beside the car. Sanders stated he was afraid that he and his girlfriend would be seriously injured because she was "short" and "real skinny" and they were outnumbered. He testified that when they "moved up and they got closer" he fired so that he and his girlfriend could get away. Sanders recalled that after he fired, White ran away, Priester stood there, and Alston ducked behind the car.

During cross-examination, Sanders admitted to shooting and killing Harrington. He stated he only fired once, and he identified the gun that matched the projectile taken from Harrington's body as his gun. Sanders explained he shot at Harrington because she was "the main one that was causing the whole everything" and "she was closer."

The jury found Sanders guilty as indicted, and the trial court sentenced him to life in prison for murder and five years' imprisonment for the weapon conviction, to run concurrently. This appeal followed.

## ISSUE ON APPEAL

Did the trial court err in admitting the contents of a text message because the text message was inadmissible hearsay and the State failed to authenticate the text message?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Washington*, 379 S.C. 120, 123, 665 S.E.2d 602, 604 (2008). "The admission or exclusion of evidence is left to the sound discretion of the trial [court], whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Washington*, 431 S.C. 394, 405, 848 S.E.2d 779, 785 (2020) (quoting *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001)). "An abuse of discretion occurs when the trial court's ruling is based on an error of law[.]" *Id.* at 405-06, 848 S.E.2d at 785 (quoting *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000)). "The improper admission of hearsay is reversible error only when the admission causes prejudice." *State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006).

## LAW/ANALYSIS

A. Authentication

Sanders argues the State failed to authenticate the text message because it failed to show if and how Garvin knew McKnight or how she obtained his phone number. He asserts Garvin did not testify that she previously communicated with McKnight using the same phone number that sent the text message, and she did not testify that she recognized the text message as McKnight's writing style. Additionally, Sanders contends the signature on the text message, "GOD S GIFT," was not related to "Johnny," "McKnight," or his nickname, "Blaze." We disagree.

Evidence is not admissible unless it is properly authenticated. *See* Rule 901(a), SCRE ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding

that the matter in question is what its proponent claims.").  Testimony from a witness with knowledge "that a matter is what it is claimed to be" can be sufficient to meet this requirement.  Rule 901(b)(1), SCRE.  "'[T]he burden to authenticate . . . is not high' and requires only that the proponent 'offer[ ] a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'"  *Deep Keel, LLC v. Atl. Priv. Equity Grp., LLC*, 413 S.C. 58, 64, 773 S.E.2d 607, 610 (Ct. App. 2015) (quoting *United States v. Hassan,* 742 F.3d 104, 133 (4th Cir. 2014)); *see also United States v. Davis*, 918 F.3d 397, 402 (4th Cir. 2019) (considering Federal Rule of Evidence 901 and holding the proponent was required to make "only a prima facie showing that the 'true author' is who the proponent claims it to be").

The trial court did not abuse its discretion by concluding the State offered sufficient evidence to satisfy the authentication requirement of Rule 901, SCRE. Garvin testified she received a text message from "Mr. Johnny McKnight" and stated McKnight was programmed into her phone under "Johnny Blaze."  Garvin then identified a screenshot from her phone as the text message she received from McKnight.  She also stated the screenshot of the text message had not been changed or altered and was a "fair and accurate" reflection of the text message she received from McKnight.  When asked how she was able to recognize the exhibit containing the screenshot of the message, Garvin stated, "Because they [sic] programmed in my phone as Johnny Blaze, and the same text is in my phone." Standing alone, this would not be sufficient to satisfy Rule 901's authentication requirement.  However, Garvin testified that prior to the admission of the text message, she received a phone call from and spoke to McKnight.  Although the trial court excluded her testimony regarding the contents of that discussion, Garvin's statements regarding this prior conversation with McKnight that same night provided circumstantial evidence sufficient to support a finding that the text message was what she claimed it to be.  *See e.g., State v. Benton*, 435 S.C. 250, 263, 865 S.E.2d 919, 926 (Ct. App. 2021) (noting the timing and distinctive characteristics of the text messages at issue—in addition to witness's identification of certain messages during his testimony—provided the circumstantial evidence necessary for authentication), *petition for cert. filed* (S.C. Dec. 20, 2021).

B. Hearsay

Sanders argues McKnight's text message was inadmissible hearsay because no hearsay exception applied.  Specifically, he asserts the State did not argue or present evidence at trial indicating McKnight was unavailable to testify, and therefore, it cannot now argue the text message was admissible under Rule 804,

SCRE.  Sanders further argues the text message was not admissible as a present sense impression, excited utterance, or then existing state of mind, emotion, sensation, or physical condition pursuant to Rules 803(1)-(3), SCRE.  We agree.

"Hearsay is an out of court statement, offered in court to prove the truth of the matter asserted."  *State v. Parvin*, 413 S.C. 497, 503, 777 S.E.2d 1, 4 (Ct. App. 2015) (quoting *State v. Townsend*, 321 S.C. 55, 59, 467 S.E.2d 138, 141 (Ct. App. 1996)); *see also* Rule 801, SCRE (providing the definition of hearsay and its scope).  "Hearsay is not admissible except as provided by [the South Carolina Rules of Evidence] or by other rules prescribed by the Supreme Court of this State or by statute."  Rule 802, SCRE.  The exceptions to the general rule against hearsay include when a hearsay statement conveys the declarant's "present sense impression," or constitutes an "excited utterance" or "then existing mental, emotional, or physical condition."  Rule 803(1)-(3), SCRE.

The trial court erred by admitting the text message into evidence because the message was hearsay with no applicable exception.  McKnight's text message was hearsay because it was an out-of-court statement offered to prove the truth of the matter asserted: Sanders was behind Harrington's apartment.  *See* 801, SCRE.  Thus, the text message was inadmissible absent an applicable exception to the general rule.  *See* Rule 802, SCRE ("Hearsay is not admissible except as provided by [the South Carolina Rules of Evidence] or by other rules prescribed by the Supreme Court of this State or by statute.").  Additionally, the text message was not admissible under any hearsay exception.  *See* Rule 803, SCRE (providing exceptions to the general rule against hearsay).  We will address each exception in turn.

First, the text message was not admissible as a present sense impression.  *See* Rule 803(1), SCRE (providing that a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is admissible under the present sense impression exception to the general rule against hearsay).  The second and third sentences of the text message—"He probably hidn 2.  Tryn sum"—did not constitute a present sense impression because they did not explain or describe an event or condition that McKnight personally perceived.  *See State v. Prather*, 429 S.C. 583, 611, 840 S.E.2d 551, 565 (2020) ("To qualify as a present sense impression: '(1) the statement must describe or explain an event or condition; (2) the statement must be contemporaneous with the event; and (3) the declarant must have personally perceived the event.'" (quoting *State v. Hendricks*, 408 S.C. 525, 533, 759 S.E.2d 434, 438 (Ct. App. 2014))).  McKnight's statement that Sanders was hiding and

trying something was not an explanation about his claim to have seen Sanders's girlfriend behind Harrington's apartment. *See id.* ("To qualify as a present sense impression: '(1) the statement must describe or explain an event or condition . . . .'" (quoting *Hendricks*, 408 S.C. at 533, 759 S.E.2d at 438)). Rather, these statements conveyed McKnight's opinion that Sanders was likely with his girlfriend behind Harrington's apartment. Regardless, the first sentence of the text message did not require an explanation. Thus, the text message was not admissible as a present sense impression.

Next, McKnight's text message was not admissible as an excited utterance because the message did not indicate he witnessed a "startling event or condition" or "was under the stress of excitement caused by [an] event or condition" when he sent the text message to Garvin. *See id.* at 611, 840 S.E.2d at 565-66 ("For a statement to be an excited utterance: '(1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition.'" (quoting *Washington*, 379 S.C. at 124, 665 S.E.2d at 604)); *see also* Rule 803(2), SCRE (providing an excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").

Finally, McKnight's text message was not admissible under Rule 803(3), SCRE, as a then existing mental, emotional, or physical condition because the message constituted a statement of McKnight's belief rather than a statement of "intent, plan, motive, design, mental feeling, pain, [or] bodily health." *See* Rule 803(3), SCRE (providing an exception to the hearsay rule for a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact").

Based on the foregoing, we find the trial court erred in admitting McKnight's text message into evidence; however, as we discuss below, we hold any error in admitting the text message was harmless.

C. Harmless Error

We hold admitting the content of the text message was harmless error because the evidence establishing Sanders's guilt was overwhelming. *See State v. Page*, 378 S.C. 476, 483, 663 S.E.2d 357, 360 (Ct. App. 2008) ("Error is harmless whe[n] it could not reasonably have affected the trial's outcome."); *State v. Vick*, 384 S.C.

189, 199, 682 S.E.2d 275, 280 (Ct. App. 2009) ("An insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached.").

We acknowledge the State had the burden of disproving self-defense, and we find the State met this burden. *See State v. Dickey*, 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011) ("[W]hen a defendant claims self-defense, the State is required to disprove the elements of self-defense beyond a reasonable doubt.").

> A person is justified in using deadly force in self-defense when:
>
> (1) The defendant was without fault in bringing on the difficulty;
>
> (2) The defendant . . . actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger;
>
> (3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable prudent man of ordinary firmness and courage would have entertained the same belief . . . ; and
>
> (4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*Id.* (quoting *State v. Wiggins*, 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998)).

The evidence showed the State disproved the elements of self-defense beyond a reasonable doubt and Sanders's guilt was conclusively proven such that no other rational conclusion could be reached. As to the element of fault in bringing on the difficulty, both Garvin and Williams testified they encountered Sanders a few days prior to the shooting when he told Garvin, "[Y]ou better get you a black dress, because I'm going to kill your daughter." Additionally, Bradley testified she heard someone trying to get into Harrington's apartment, and when Harrington returned soon afterwards, Sanders and his girlfriend were near the apartments.

As to his belief that he was in imminent danger of losing his life or suffering serious bodily harm, Sanders testified he was "scared" that he and his girlfriend would be hurt or seriously injured during the confrontation with Harrington. However, we find the evidence conclusively showed no person of ordinary firmness and courage would have entertained the same belief. Priester, White, and Marquis testified they all exited the vehicle when Harrington pulled up in front of the apartments near the laundromat. Although their testimonies were conflicting as to who remained close to Harrington as she approached Sanders and his girlfriend, they testified consistently that Harrington was unarmed and no one tried to strike Sanders. Sanders also testified no one hit him. Moreover, although Sanders indicated Harrington implied she had a gun in the car, he never stated he saw anyone with a weapon or believed anyone was armed. Additionally, the pathologist who conducted the autopsy testified Harrington weighed 105 pounds and was about five feet, six inches tall. White described Harrington as "skinny" and "tall" and described Sanders as "short" and having "a little muscle, a little weight." Sanders's testimony did not contradict the evidence of Harrington's slight weight, that Harrington was neither armed nor appeared to be armed, or that White, Priester, or Alston were not armed nor appeared to be armed. Sanders testified Alston stayed near the car, White was near Harrington, and Priester was on the other side of Harrington "but just standing there." Further, based on his testimony, Harrington was the only one who made a threatening statement. The foregoing evidence conclusively showed no person of ordinary firmness and courage would have entertained the belief that he was in imminent danger of death or serious bodily injury under the same circumstances so as to justify the use of deadly force.

As to whether Sanders had any other probable means of avoiding the danger, the evidence also conclusively showed he could have avoided the danger without using deadly force. Even according to Sanders's testimony, no one other than Harrington—who weighed only 105 pounds—was threatening him with violence, and he did not dispute that Harrington was unarmed. Further, there is no indication in the record that Sanders believed any of the other three to be armed. Both Priester and White testified everyone was in the street when the shooting occurred, and White stated there was plenty of room to move around. In addition, photographs from the scene demonstrate this, and State's Exhibits 8-10 show a large pool of blood in the middle of the street between the laundromat and the apartments. The photographs also show a large, open area, and White testified no one prevented Sanders from leaving. Therefore, the evidence conclusively showed Sanders could have avoided the danger without using deadly force by simply leaving.

Based on the foregoing, we hold the trial court's error in admitting the hearsay evidence was harmless because it could not reasonably have affected the outcome at trial.

**CONCLUSION**

Accordingly, Sanders's convictions and sentences are

**AFFIRMED.**

**WILLIAMS, C.J., MCDONALD, J., and LOCKEMY, A.J., concur.**